**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.09-80554-Civ-MARRA/JOHNSON

OFFICE DEPOT, INC.,

       Plaintiff,

vs.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA. and
AMERICAN CASUALTY COMPANY OF
READING PA,

       Defendants.

_____/

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT AMERICAN CASUALTY COMPANY OF READING PA'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Daniel J. Standish (*pro hac vice*)
Gary P. Seligman (*pro hac vice*)
John E. Howell (*pro hac vice*)
WILEY REIN LLP
1776 K Street NW
Washington, DC  20006
TEL: 202.719.7000
FAX: 202.719.7049

Neil S. Baritz  (Fla. Bar No. 0003468)
Craig R. Glasser (Fla. Bar No. 0008567)
BARITZ & COLMAN LLP
1075 Broken Sound Pkwy, NW
Suite 102
Boca Raton, FL 33487
TEL: 561.864.5100
FAX: .561.864.5101

*Attorneys for Intervenor-Defendant American Casualty Company of Reading PA*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................... 1

II.     FACTUAL BACKGROUND ....................................................................... 2

    A.    The Insurance Contracts ..................................................................... 2

    B.    Policy Terms and Conditions............................................................... 2

    C.    The Events for Which Office Depot Seeks Coverage .......................... 4

        1.   Dow Jones Newswire Publishes an Article Concerning Possible
            Regulation FD Violations ..................................................... 4

        2.   The SEC Begins an Informal Inquiry. ...................................... 5

        3.   Office Depot's Audit Committee Commences an Internal
            Investigation in Response to a Whistleblower Complaint that
            Culminates in a Restatement...................................................... 5

        4.   Plaintiffs Commence Securities Class Actions and Derivative
            Actions ..................................................................................... 6

        5.   The SEC Issues a Formal Order of Investigation ..................... 7

III.    ARGUMENT.............................................................................................. 7

    A.    The Legal Questions of Insurance Contract Interpretation at Issue are Ripe
        for Disposition by Summary Judgment ............................................... 7

    B.    The SEC Investigation of Office Depot Does Not Constitute a Securities
        Claim..................................................................................................... 8

        1.   The Definition of "Securities Claim" Clearly Distinguishes
            Between a "Proceeding" and an "Investigation" and Affords
            Coverage Only for the Former................................................... 8

        2.   The SEC Inquiry and Investigation Do Not Constitute a Covered
            "Proceeding."............................................................................ 9

    C.    The Policies Do Not Provide Coverage for Voluntary Cooperation with
        the SEC Prior to the Issuance of Subpoenas or Wells Notices............ 12

    D.    The Policies Apply to Necessary Costs Resulting "Solely" from Defense
        of Claims............................................................................................. 14

        1.   The Policies Do Not Apply to Costs Incurred in Connection with
            the SEC Investigation and Internal Investigation. ................... 15

        2.   The SEC Response Costs and Audit Committee's Work Were Not
            "Necessary" for Defense of the Litigation............................... 17

i

**TABLE OF CONTENTS**
(continued)

**Page**

E.    The Making of A Claim Does Not Retroactively Transform All Sums Incurred Prior to the Claim into Defense Costs ................................................... 19

IV.    CONCLUSION............................................................................................................ 20

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Creative Hospitality Ventures, Inc. v. United States Liability Insurance Co.*,
   655 F. Supp. 2d 1316 (S.D. Fla. 2009) ........................................................................7

*Dietz v. Smithkline Beecham Corp.*,
   598 F.3d 812 (11th Cir. 2010) .......................................................................................7

*Excess Risk Underwriters, Inc. v. Lafayette Life Insurance Co.*,
   328 F. Supp. 2d 1319 (S.D. Fla. 2004) ........................................................................8

*Guideone Elite Insurance Co. v. Old Cutler Presbyterian Church, Inc.*,
   420 F.3d 1317 (11th Cir. 2005) .....................................................................................8

*National Stock Exchange v. Federal Insurance Co.*,
   No. 06 C1603, 2007 WL 1030293 (N.D. Ill. Mar. 30, 2007) ..........................15, 17, 20

*North River Insurnce Co. v. Broward County Sheriff's Office*,
   428 F. Supp. 2d 1284 (S.D. Fla 2006) ........................................................................7

*Riley v. Merrill Lynch, Pierce, Fenner & Smith*, Inc.,
   292 F.3d 1334 (11th Cir. 2002), *abrogated on other grounds sub nom.*
   *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
   547 U.S. 71 (2006) .......................................................................................................19

### **STATE CASES**

*Auto-Owners Insurance Co. v. Anderson*,
   756 So. 2d 29 (Fla. 2000).............................................................................................8

*Garcia v. Federal Insurance Co.*,
   969 So. 2d 288 (Fla. 2007)...........................................................................................8

*Galen Health Care, Inc. v. American Casualty Co.*,
   913 F. Supp. 1525 (M.D. Fla 1996).............................................................................7

*Meyer v. Hutchinson*,
   861 So. 2d 1185 (Fla. Dist. Ct. App. 2003) ...............................................................10

*Premier Insurance Co. v. Adams*,
   632 So. 2d 1054 (Fla. Dist. Ct. App. 1994) ...............................................................10

*Raymond Corp. v. National Union Fire Insurance Co.,*
   833 N.E.2d 232 (N.Y. 2005).........................................................................7

*Swire Pacific Holdings, Inc. v. Zurich Insurance Co.,*
   845 So. 2d 161 (Fla. 2003)..........................................................................8

## FEDERAL STATUTES AND REGULATIONS

15 U.S.C. § 77z-1(b)(1) ................................................................................18

15 U.S.C. § 78m............................................................................................17

15 U.S.C. § 78u(b) ........................................................................................13

17 C.F.R. § 202.5 .....................................................................................11, 13

17 C.F.R. § 243.100......................................................................................5

## LEGISLATIVE MATERIALS

H.R. Rep. 104-396 (1995) (Conf. Rep.) ...................................................18, 19

S. Rep. No. 104-98 (1995)........................................................................19

## I.    __INTRODUCTION__

Plaintiff Office Depot, Inc. ("Office Depot") seeks insurance coverage for over $23 million in fees and costs it has incurred in connection with various matters beginning in the summer of 2007. Office Depot asserts that the entire amount constitutes "Defense Costs" as defined by the Executive and Organization Liability Insurance Policy issued by defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), to which an excess insurance policy issued by American Casualty of Reading PA ("American Casualty") follows form. The sums for which Office Depot seeks coverage are not limited to amounts expended in obtaining dismissal of securities and derivative litigation and indemnification of insured individuals for responding to subpoenas issued by the Securities & exchange Commission ("SEC") and Wells notices—for which National Union has acknowledged coverage subject to a reservation of rights. Office Depot also seeks to recover the costs of responding to an SEC investigation of the company, an internal investigation undertaken in response to a whistleblower complaint, and Office Depot's resulting restatement of its financials.

The insurance policies at issue, however, afford coverage only for "reasonable and necessary" sums "resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim**." Under the plain language of the policies, "Claim" does not include an investigation of Office Depot itself, nor does the SEC's "investigation" constitute a "proceeding" to which the policies apply. Nor does the policy language permit Office Depot to force such costs into the carefully defined coverage for "Defense Costs" by claiming that efforts undertaken in response to matters that do not constitute "Claims," such as Office Depot's response to the SEC's investigation or Audit Committee investigation and restatement, are somehow "relevant" to the subsequent litigation to which the policies respond. Such sums quite clearly do not "result[]" solely" from the securities and derivative litigation. Accordingly, American Casualty is entitled

to summary judgment in its favor declaring that the vast bulk of the more than $23 million

sought by Office Depot is not covered under the policies.[1]

## II.   FACTUAL BACKGROUND

### A.   The Insurance Contracts

National Union issued Executive and Organization Liability Insurance Policy No. 965-

63-88 to Office Depot for the period from November 30, 2006 to November 30, 2007 (the

"Primary Policy"). American Casualty's Statement of Undisputed Material Facts ("Statement")

¶ 1. The Primary Policy has a limit of liability of $25 million, subject to a $2.5 million retention

and a coinsurance provision obligating Office Depot to retain liability for 20% of any covered

"Loss" incurred in connection with Securities Claims, as defined by the Primary Policy. *Id.* ¶ 2.

American Casualty issued Excess Insurance Policy No. 169551735 to Office Depot for

the same period from November 30, 2006 to November 30, 2007 ("Excess Policy") (collectively

with the Primary Policy, the "Policies"). *Id.* ¶ 3. The Excess Policy provides specified coverage

in excess of the Primary Policy and applies in conformance with the provisions of the Primary

Policy, except for the premium, Limit of Liability, and as otherwise specifically set forth in the

provisions of the Excess Policy. *Id.* ¶ 4. The Excess Policy has a limit of liability of $15

million, which applies in excess of the $25 million limit of the Primary Policy. *Id.* ¶ 5.

### B.   Policy Terms and Conditions

As relevant here, the Primary Policy affords specified coverage to Office Depot as the

insured "Organization" (in contrast to the coverage afforded directly to Office Depot's directors

and officers as "Insured Persons."). First, Coverage B(i) applies to "the **Loss** of any

**Organization** arising from a **Securities Claim** made against such **Organization** for any

**Wrongful Act** of such **Organization**." Statement ¶ 6. Second, Coverage B(ii) applies to "the

---

[1]     American Casualty also joins National Union's Motion for Summary Judgment.

**Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** . . . for any **Wrongful Act** of such **Insured Person**, but only to the extent that such **Organization** has indemnified such **Insured Person**." *Id.*

The Primary Policy defines "Securities Claim" as

> a **Claim**, *other than an administrative or regulatory proceeding against, or investigation of an Organization*, made against any **Insured**:
>
> (1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities . . . which is:
>
> > (a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or
> >
> > (b) brought by a security holder of an **Organization** with respect to such security holder's interest in securities of such **Organization**; or
>
> (2) brought derivatively on the behalf of an **Organization** by a security holder of such **Organization**.
>
> Notwithstanding the foregoing, the term "Securities Claim" shall include an *administrative or regulatory proceeding against an Organization*, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**.

*Id.* ¶ 7 (emphasis added). Thus, the definition initially excepts both administrative and regulatory *proceedings* against and *investigations* of the Organization, but carves back coverage only for proceedings against—not investigations of—the Organization. And coverage exists even then "only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**." *Id.*

Under the Primary Policy, "Claim" means:

> (1) a written demand for monetary, non-monetary or injunctive

relief;

(2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading; (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges; or

(3) a civil, criminal, administrative or regulatory investigation of an **Insured Person**:

(i) once such **Insured Person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) may be commenced; or

(ii) in the case of an investigation by the SEC or a similar state or foreign government authority, after the service of a subpoena upon such **Insured Person**.

The term "**Claim**" shall include any **Securities Claim** and any **Employment Practices Claim**.

*Id*. ¶ 8. In contrast to the definition of Securities Claim, which does not encompass investigations of the Organization, "Claim" includes investigations of Insured Persons subject to discrete signal events that trigger coverage, such as the issuance of subpoenas or Wells notices.

"Loss" to which the Policy applies includes "damages, settlements, judgments (including pre/post-judgment interest on a covered judgment), [and] **Defense Costs**." *Id*. ¶ 9. "Defense Costs" are defined as "reasonable and necessary fees, costs and expenses consented to by the Insurer . . . resulting *solely* from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**." *Id*. ¶ 10 (emphasis added).

C.    The Events for Which Office Depot Seeks Coverage

1.    Dow Jones Newswire Publishes an Article Concerning Possible Regulation FD Violations.

On June 29, 2007, the Dow Jones Newswire published an article reporting that Office

4

Depot may have made improper disclosures to certain analysts, potentially implicating the SEC's

Regulation FD (Fair Disclosure), which precludes issuers of securities from selectively

disclosing material nonpublic information. *Id.* ¶ 12; 17 C.F.R. § 243.100. However, even before

the article's publication, Office Depot was aware of at least some of the allegations contained in

the report and had already hired outside counsel to address concerns regarding the assertions. *Id.*

¶ 14. Office Depot forwarded the Dow Jones Newswire article to its insurers by e-mail on July

11, 2007, denominating the notice a "Notice of Circumstances." *Id.* ¶ 13.

> **2.      The SEC Begins an Informal Inquiry.**

On July 17, 2007, the SEC issued a "letter of inquiry" to Office Depot "looking into

[Office Depot]'s contacts and communications with financial analysts during 2007." *Id.* ¶¶ 16-

17. Acting as a good "corporate citizen," Office Depot opted voluntarily to cooperate with the

SEC's inquiry by providing documents and making its employees and officers available for

sworn testimony without the issuance of subpoenas. *Id.* ¶¶ 18-19. On July 20, 2007, Office

Depot provided notice of the SEC's inquiry letter to certain of its insurers by an email again

denominated as a "Notice of Circumstances" and indicating that it provided "Supplemental

Info." to the prior notice of circumstances concerning the June 29, 2007 Dow Jones Newswire

article. *Id.* ¶ 20.

> **3.      Office Depot's Audit Committee Commences an Internal
>          Investigation in Response to a Whistleblower Complaint that
>          Culminates in a Restatement.**

In July 2007, prior to receipt of the SEC's informal inquiry, Office Depot received an

internal whistleblower letter that "alleged various improprieties with respect to accounting." *Id.*

¶ 21. An internal review by Office Depot's Audit Committee relating principally to the timing of

Office Depot's recognition of certain vendor program funds "arose from" the whistleblower

letter. *Id.* ¶ 22. The Audit Committee had retained counsel in connection with its review no later

than July 11, 2007. *Id.* ¶ 23. In addition, the Audit Committee retained accountants and consultants to assist "in making sure that the books and records were reflected accurately," (*id.* ¶ 25), and to "to assist [Office Depot] with reviewing the facts and determining whether [Office Depot] needed to do a restatement," *Id.* ¶ 28. Office Depot also retained a forensic accountant to help Office Depot "investigate some of the allegations that were made" in the July 2007 whistleblower letter. *Id.* ¶ 26.

Office Depot delayed its third-quarter 2007 earnings release due to the Audit Committee's investigation and, as a result of the internal investigation, took actions to remedy deficiencies identified. *Id.* ¶ 24. In addition, "[b]ased on the [Audit Committee's investigation], the Audit Committee concluded that the funds due or received from vendors previously recognized [in certain periods] . . . should be deferred into later periods." *Id.* ¶ 31. "As a result of the Audit Committee's review," the Board of Directors approved a restatement of Office Depot's financial statements for 2006, including changes to amounts reported in the first and second quarters of 2007. *Id.* ¶ 30. Office Depot "self-reported to the SEC the issues that . . . were subject to the restatement." *Id.* ¶ 32. In or around November 2007, the SEC expanded its inquiry into the timing of recognition of vendor program funds. *Id.* ¶ 33.

**4.     Plaintiffs Commence Securities Class Actions and Derivative Actions.**

In November 2007, two shareholder derivative lawsuits (the "Derivative Actions") and two securities lawsuits (the "Securities Actions") were filed naming Office Depot and certain directors and officers. *Id.* ¶ 34. The Securities Actions alleged that Office Depot and certain of its officers made material misrepresentations and omissions regarding Office Depot's reporting of vendor rebates. *Id.* ¶ 35. Based on Office's Depot's motion, the court dismissed the Securities Actions prior to any discovery. *Id.* ¶ 38. The Derivative Actions alleged that the defendants breached fiduciary duties to Office Depot by causing the company to misrepresent its

financial results and prospects in connection with the recognition of discounts in its vendor programs. *Id.* ¶ 36.  Like the Securities Actions, the Derivative Actions were dismissed before any discovery took place.  *Id.* ¶ 37.

### 5.      The SEC Issues a Formal Order of Investigation.

The SEC issued a formal order of investigation on January 10, 2008.  *Id.* ¶ 39.  At least eight current or former employees or officers of Office Depot have received subpoenas pursuant to the SEC's formal order.  *Id.* ¶ 40.  And three of Office Depot's Officers have received so-called Wells Notices from the SEC, indicating that the SEC's enforcement division intends to recommend to the Commission that enforcement proceedings be instituted.  *Id.* ¶ 43.  Office Depot has reached a proposed settlement with the staff of the SEC.  *Id.* ¶ 44.

## III.   <u>ARGUMENT</u>

### A.      <u>The Legal Questions of Insurance Contract Interpretation at Issue are Ripe for Disposition by Summary Judgment.</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010) (quoting Fed. R. Civ. P. 56(c)(2)).  [T]he interpretation of language in an insurance policy is a question of law properly decided on summary judgment." *North River Ins. Co. v. Broward County Sheriff's Office*, 428 F. Supp. 2d 1284, 1288 (S.D. Fla. 2006) (quoting *Galen Health Care, Inc. v. American Co. of Reading*, 913 F. Supp. 1525, 1528 (M.D. Fla.1996)).[2]

---

[2]      To the extent that New York law may apply, *see Creative Hospitality Ventures, Inc. v. United States Liab. Ins. Co.*, 655 F. Supp. 2d 1316, 1324 (S.D. Fla. 2009) (noting that Florida's *lex loci contractus* choice-of-law rule "provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage"), New York law and that of Florida do not differ materially with respect to the legal questions of insurance contract interpretation before the Court. *See, e.g., Raymond Corp. v. Nat'l Union Fire Ins. Co.*, 833 N.E.2d 232, 234 (N.Y. 2005) (holding that courts should "not disregard clear

Under Florida law, "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Where "the terms of an insurance contract are clear and unambiguous, Florida law requires a court to interpret the contract in accordance with its plain meaning, and, unless an ambiguity exists, a court should not resort to outside evidence or the complex rules of construction to construe the contract." *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 328 F. Supp. 2d 1319, 1338 (S.D. Fla. 2004) (internal quotation marks and citations omitted). The Florida Supreme Court has underscored that "[a policy] provision is not ambiguous simply because it is complex or requires analysis," *Garcia v. Federal Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007), nor does the fact that a term is undefined automatically render the term ambiguous. *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 167 (Fla. 2003). Moreover, "courts must not add meaning to the terms of an insurance policy to create ambiguity where none exists." *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1327 (11th Cir. 2005).

**B.    The SEC Investigation of Office Depot Does Not Constitute a Securities Claim.**

**1.    The Definition of "Securities Claim" Clearly Distinguishes Between a "Proceeding" and an "Investigation" and Affords Coverage Only for the Former.**

The Policies afford entity coverage for Office Depot itself only for Loss arising from Securities Claims. Statement ¶ 6. Although the Policies afford coverage for SEC investigations with respect to Insured Persons, an investigation of Office Depot—the "Organization"—falls outside the definition of Securities Claim. That definition expressly excepts investigations of the Organization, specifying that "'**Securities Claim**' means a **Claim**, *other than an administrative*

provisions which the insurers inserted in the policies and the insured accepted, and equitable considerations will not allow an extension of coverage beyond its fair intent and meaning" (quotation marks and citation omitted)).

or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured**." *Id.* ¶ 7. (emphasis added). After excepting both "proceeding[s]" and "investigation[s]" from the Policies' reach, the definition then restores coverage only for "proceeding[s]," albeit subject to additional limitations: "Notwithstanding the foregoing, the term '**Securities Claim**' shall include an administrative or regulatory *proceeding against* an **Organization**, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**." *Id.* This carve-back does not encompass "investigation[s]" at all. Given the clear distinction between a "proceeding against" Office Depot and an "investigation of" Office Depot in the definition's first sentence, the only reasonable interpretation of the carve-back is that it does not extend to any investigation of Office Depot. As a result, the Policies do not afford coverage for costs incurred by Office Depot in connection with the SEC investigation of Office Depot.

2.     **The SEC Inquiry and Investigation Do Not Constitute a Covered "Proceeding."**

Stymied by the clear demarcation between a "proceeding" on the one hand and an "investigation" on the other contained in the Securities Claim definition, Office Depot attempts to recast the SEC's investigation as a "proceeding." The attempt fails, however, in the face of both the Policy language and the SEC's own practice.

First, as a type of "Claim," the definition of "Securities Claim" incorporates the Primary Policy's definition of "Claim." Like the "Securities Claim" definition, the definition of "Claim" contained in Section 2(b) of the Primary Policy draws the same bright line between a "proceeding" and an "investigation." Under Section 2(b), a "proceeding" and an "investigation" trigger coverage upon the occurrence of clearly enumerated and distinct events. "[A] civil, criminal, administrative, regulatory or arbitration *proceeding*" must be "commenced by: (i)

service of a complaint or similar pleading; (ii) the return of an indictment, information or similar document . . .; or (iii) receipt of a filing of a notice of charges." *Id.* ¶ 8, Section 2(b)(2) (emphasis added). By contrast, "a civil, criminal, administrative or regulatory *investigation of an Insured Person*" implicates the policy only "once such **Insured Person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) may be commenced" or, "in the case of an investigation by the SEC . . ., after the service of a subpoena upon such **Insured Person**." *Id.*, Section 2(b)(3) (emphasis added).

The Primary Policy clearly treats a "proceeding" as conceptually distinct from an "investigation." To ignore the distinction between an "administrative or regulatory proceeding" and an "investigation" would render the Primary Policy's detailed specification of potentially covered investigations without meaning. Such an interpretation would be contrary to Florida law, under which "[a]n interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable." *Premier Ins. Co. v. Adams*, 632 So. 2d 1054, 1057 (Fla. Dist. Ct. App. 1994); *see also Meyer v. Hutchinson*, 861 So. 2d 1185, 1188 (Fla. Dist. Ct. App. 2003) ("Florida courts have long held that insurance contract provisions are not to be construed as meaningless."). To treat investigations simply as a subset of proceedings runs contrary to the carefully delineated categories drawn by the Primary Policy.

Second, the line of demarcation between proceedings and investigations drawn in the Primary Policy parallels the same line drawn by the SEC. Commission regulations provide, for example:

> (a) Where, from complaints received from members of the public, communications from Federal or State agencies, examination of filings made with the Commission, or otherwise, it appears that there may be violation of the acts administered by the Commission or the rules or regulations thereunder, a *preliminary investigation* is generally made. In such

> *preliminary investigation* no process is issued or testimony compelled. The Commission may, in its discretion, make such *formal investigations* and authorize the use of process as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or the rules of a self-regulatory organization of which the person is a member or participant. . . .
>
> (b) *After investigation or otherwise the Commission may in its discretion take one or more of the following actions: Institution of administrative proceedings* looking to the imposition of remedial sanctions, initiation of injunctive *proceedings* in the courts, and, in the case of a willful violation, reference of the matter to the Department of Justice for criminal *prosecution*.

17 C.F.R. § 202.5 (emphasis added).   As these regulations demonstrate, "administrative proceedings" may be instituted "after investigation" but are not themselves investigations.

The SEC Enforcement Manual further confirms that the initiation of an informal inquiry or issuance of a formal order of investigation does not commence an enforcement "proceeding." *See* SEC, Div. of Enforcement, Enforcement Manual ("SEC Manual") §§ 2.3-2.5 (available at http://www.sec.gov/divisions/enforce/enforcementmanual.pdf). The SEC investigative process involves a number of stages before a proceeding is initiated, beginning as a Matter Under Inquiry and progressing with the issuance of a Formal Order of Investigation, which confers subpoena power, and the issuance of a "Wells Notice." *Id.* The SEC provides persons under investigation with a so-called "Wells Notice" to inform them that that "the Division [of Enforcement] is considering recommending or intends to recommend that the Commission file an action or proceeding against them" and permit the person to submit argument or evidence to the Division of Enforcement or the Commission itself regarding the recommendation. *Id.* at § 2.4. Only with the Commission's authorization may an administrative proceeding be commenced. *Id.* The SEC Enforcement Manual again confirms that "proceedings" that may be instituted by the SEC are distinct from formal and informal "investigations" that precede such proceedings.

Third, even if one were to view the SEC "investigation" as an administrative or regulatory "proceeding," the SEC's informal inquiry letter still would not meet the Primary Policy's definition of Claim.  Under this definition, a potentially covered "proceeding" must be commenced by "service of a complaint or similar pleading"; "the return of an indictment, information or similar document"; or "receipt of a filing of a notice of charges."  Statement ¶ 8.  The letter of inquiry and investigative order were not commenced through any of these procedural steps.

Under the clear language of the Primary Policy and entirely consistent with SEC published guidance and regulation, the SEC's investigation of Office Depot is nothing other than an "investigation"—not an administrative or regulatory "proceeding" within the definitions of "Claim" and "Securities Claim."

C.      **The Policies Do Not Provide Coverage for Voluntary Cooperation with the SEC Prior to the Issuance of Subpoenas or Wells Notices.**

In addition to entity coverage for Securities Claims, the Policies afford coverage for Loss arising from Claims against Insured Persons.  Statement ¶ 6.  As discussed above, the Primary Policy defines "Claim" to include an investigation of an Insured Person, but only after such Insured Person is served with a subpoena or is identified in writing as a person against whom a civil, criminal, administrative or regulatory proceeding may be commenced.  *Id.* ¶ 8.  The definition of "Claim" therefore provides a bright line by which to determine when during the course of an SEC investigation of an Insured Person a Claim has been made for purposes of the coverage grant in the Policies.  Prior to these signal events—the issuance of a subpoena or a writing identifying the Insured Person as a person against whom a proceeding may be commenced—a Claim does not exist, and the Policies do not apply.

Office Depot contends that costs incurred by its officers and employees who voluntarily

gave testimony or provided documents to the SEC prior to issuance of a subpoena or Wells notice to those individuals, as well as the costs incurred by Office Depot itself at the informal inquiry stage, constitute Defense Costs on the theory that the SEC's requests for voluntary cooperation are "akin to a subpoena." Declaration of John E. Howell in Support of American Casualty's Mot. for Summ. J. ("Howell Decl."), Ex. D at 71:6-7. However, the Policies apply to "Claims," not steps that are "akin to" "Claims."

First, Office Depot's "akin to" argument has absolutely no basis with respect to Office Depot itself. The Primary Policy's definition of "Claim" plainly extends only to "a civil, criminal, administrative or regulatory investigation *of an Insured Person*." Statement ¶ 8 (emphasis added). An SEC investigation of an Insured Person constitutes a Claim only after such Insured Person is served with a subpoena or is identified in writing "as a *person* against whom a proceeding as defined in Definition (b)(2) may be commenced." *Id.*, Section 2(b)(3)(i) (emphasis added). Office Depot is the "Organization"; it is quite clearly not an "Insured Person." Howell Decl., Ex. B, Sections 2(o), 2(t).

Second, as to Insured Persons, reading the Primary Policy to apply when no subpoena or Wells notice has been issued effectively rewrites the definition of Claim. The Primary Policy explicitly limits the definition of Claim to include only investigations after an Insured Person has been served with a subpoena or identified in writing as a person against whom a proceeding may be brought. A letter or other inquiry by the SEC seeking voluntary cooperation is obviously not a subpoena, which is enforceable in United States District Court. *See* 15 U.S.C. § 78u(b). SEC regulations confirm that at such preliminary investigation stage, "no process is issued or testimony compelled." 17 C.F.R. § 202.5(a). Interpreting the definition of "Claim" to include a request for voluntary cooperation would abrogate the Primary Policy's clear specification that an

SEC investigation becomes a Claim only "after the service of a subpoena" and would render

Section 2(b)(3)(ii) of the Primary Policy meaningless. The definition of Claim plainly

contemplates a period—*before* the service of a subpoena upon an Insured Person—during which

any inquiry or investigation by the SEC does not constitute a Claim. This reinforces the

conclusion that the voluntary appearance by a witness or voluntary production of documents

before the issuance of a subpoena is not activity undertaken in defense of a "Claim."

Office Depot retained counsel and produced documents on behalf of employees and

officers who did not receive a subpoena. Statement ¶¶ 18, 45. Office Depot voluntarily

complied with the SEC's requests because, "as a corporate citizen," it "wants to cooperate with

the SEC" and "is going to cooperate to the best of our ability" and "not going to object . . . to

producing information and to producing witnesses until they give us a subpoena." Howell Decl.,

Ex. D at 176:10-19. Whatever the benefits of this approach, the activity falls outside the

Policies' coverage grant.

**D.     The Policies Apply to Necessary Costs Resulting "Solely" from Defense of Claims.**

Defense Costs are "reasonable and necessary fees, costs and expenses consented to by the

Insurer . . . resulting *solely* from the investigation, adjustment, defense and/or appeal of a

*Claim*." Statement ¶ 10 (emphasis added). The vast majority of the amounts for which Office

Depot seeks coverage clearly resulted from matters other than "Claims." In pursuit of coverage,

Office Depot has contended that fees and costs incurred in connection with its responses to the

SEC constitute Defense Costs attributable to the Securities Actions because the documents

produced to the SEC are related to the subject matter of the Securities Actions and gathering

such information "would facilitate and confirm Office Depot's position that those lawsuits

lacked legal merit." Howell Decl., Ex. P, Response Nos. 2, 4. Even Office Depot concedes,

however, that based on the dismissal of the Securities and Derivative Actions that "this value has not been recognized yet." *Id.*, Ex. D at 246:11-247:24. But even if that value is eventually recognized, the costs did not result "solely" from the defense of any Claim and therefore remain Office Depot's responsibility.

Another federal district has rejected the same argument Office Depot now presses here. *National Stock Exch. v. Federal Ins. Co.*, No. 06 C 1603, 2007 WL 1030293 (N.D. Ill. Mar. 30, 2007). The court there concluded that fees incurred in connection with an informal SEC inquiry did not constitute "Defense Costs" under the liability policy at issue merely because they were purportedly useful and reasonably related to defending a later SEC investigation that constituted a "Claim." *Id.* at *6. In *National Stock Exchange*, the insured sought fees and costs incurred prior to the issuance of a formal investigative order by the SEC, which, under the specific policy language at issue, the court had found to be a covered claim. *Id.* The insured contended that fees and costs incurred in response to an SEC letter informing the insured of a preliminary investigation should constitute covered defense costs because the legal services "were useful to defendant and reasonably related to defending against" the subsequent formal investigation. *Id.* Without examining whether such fees and costs were useful or reasonably related to defending against the subsequent claim, the court determined that the plain language of the policy at issue did not cover "the costs incurred in defending or investigating *potential* claims," and that "common sense dictates that a Claim must first exist in order for [an insured] to defend or investigate it." *Id.* (emphasis in original). Common sense dictates the same result here.

### 1.    The Policies Do Not Apply to Costs Incurred in Connection with the SEC Investigation and Internal Investigation.

By Office Depot's own admission, the lion's share of the work for which Office Depot seeks coverage was directly undertaken for purposes other than defense or investigation of the

Securities or Derivative Actions.  Specifically, various firms and vendors were retained in

connection with the company's internal investigation in response to the July 2007 whistleblower

complaint and the SEC's subsequent inquiry:

- Office Depot retained McDermott Will & Emery before the company had even received the SEC's informal inquiry letter, Dow Jones Newswire Article, or July 2007 whistleblower letter and months before the Securities Actions were filed. Statement ¶ 15.

- Forensic accounting firm AlixPartners was retained to help "investigate some of the allegations that were made" in the whistleblower letter.  *Id.* ¶ 26.

- Deloitte & Touche was hired in connection with "what eventually became the restatement" and "provided assistance" with regard to the accounting work in connection with Office Depot's restatement of its financials.  *Id.* ¶ 27.

- Office Depot's outside counsel hired KPMG specifically to provide services in connection with the SEC investigation.  *Id.* ¶ 42

- Hogan & Hartson was retained as counsel for Office Depot in connection with Office Depot's cooperation with the SEC's inquiry and formal investigation of Office Depot (separate and apart from that firm's role as defense counsel in the Securities and Derivative Actions).  *Id.* ¶ 41.

- Huron Consulting Group was retained to assist with determining "whether [Office Depot] needed to do a restatement." *Id.* ¶ 28.

- Additional law firms were retained to represent Office Depot officers and employees who did not receive subpoenas or Wells Notices from the SEC in connection with the SEC investigation.  *Id.* ¶¶ 18, 45.

Amounts incurred for such activities are not fees and costs resulting "solely" from the

defense or investigation of the Securities or Derivative Actions.

Office Depot's attempt to recover the costs it incurred in its internal investigation and

concomitant restatement of financials exemplifies its overreaching in this case.  Beginning no

later than July 2007, Office Depot's Audit Committee undertook a review of accounting for

vendor program funds.  Statement ¶¶ 23-24.  The Audit Committee's review "arose from" a

whistleblower letter.  *Id.* ¶ 22.  The Audit Committee retained Debevoise & Plimpton in July

2007, before Office Depot received the SEC's informal inquiry letter and well before the

Securities Actions were filed. *Id.* ¶ 23. Office Depot's board approved a restatement of Office

Depot's financial results on November 8, 2007 as a result of the review. *Id.* ¶ 30. The Securities

and Derivative Actions were filed November 5, 6 and 8, 2007. *Id.* ¶¶ 34, 36.

Because the Audit Committee's review was essentially complete as the Securities and

Derivative Actions were just beginning, the expense of the Audit Committee investigation

clearly did not result "solely" from the defense or investigation of the Securities and Derivative

Actions or even the SEC investigation. *See Nat'l Stock Exch.*, 2007 WL 1030293, at *6 ("a

Claim must first exist in order for [an insured] to defend or investigate it"). Moreover, Office

Depot's public announcement unequivocally stating that the Audit Committee's review "arose

from a whistleblower complaint," (Statement ¶ 22), forecloses Office Depot's post facto

contention that those same amounts resulted "solely" from the defense or investigation of a

covered Claim. Similarly, Office Depot's obligations to review potential accounting issues and

to restate its financial statements result from duties imposed by the federal securities laws,

including the Securities and Exchange Act of 1934, the Sarbanes-Oxley Act of 2002, and

associated rules and regulations. *E.g.*, 15 U.S.C. § 78m. The costs of fulfilling such corporate

obligations are not Defense Costs covered by the Policies; they are costs of ensuring compliance

with the law—costs of doing business.

**2.      The SEC Response Costs and Audit Committee's Work Were Not "Necessary" for Defense of the Litigation.**

Putting aside the fact that the sums spent by Office Depot to conduct its internal

investigation and respond to the SEC's investigation did not result "solely" from a "Claim," their

purported utility with respect to the Securities and Derivative Actions is highly dubious given

that those suits were dismissed before any discovery took place. Moreover, even if the Primary

Policy admitted of a construction that used the usefulness of an expenditure as a benchmark for coverage—which it plainly does not—the contract language imposes the requirement that all sums constituting Defense Costs must be "necessary." None of the sums Office Depot seeks to force into the confines of the policy language meets this standard.

The Derivative Actions were voluntarily dismissed early in the proceedings. Statement ¶ 37. And, as Office Depot acknowledges, the motion to dismiss the Securities Actions was granted with prejudice. *Id.* ¶ 38. Office Depot's production of documents and presentation of witness testimony to the SEC was not necessary for the conduct of discovery in litigation that did not advance past the pleading stage.

Nor are Office Depot's attempts to recast this work as necessary to prepare motions to dismiss availing. Office Depot's motion to dismiss the Securities Actions argued successfully that the actions failed to state a claim upon which relief could be granted, and specifically that the complaints failed to plead scienter adequately. Howell Decl., Ex. L at 8-11; *id.*, Ex. S. Office Depot has not offered any explanation as to how a massive document production and extensive witness testimony were necessary to "confirm" the position that the allegations of the Securities Actions were legally insufficient. Activity undertaken to respond to the SEC's investigation of Office Depot—or to conduct an internal review and restatement—was not required by the Securities Actions.

Moreover, the stay mandated by the Private Securities Litigation Reform Act ("PSLRA") obviated precisely the enormous expense that Office Depot now wishes to impose on its insurers in the name of "necessary" defense costs. The PSLRA imposes a stay on discovery during the pendency of a motion to dismiss. PSLRA, Pub. L. No. 104-67, § 101, codified at 15 U.S.C. § 77z-1(b)(1). The stay is "intended to prevent unnecessary imposition of discovery costs on

defendants." H. Rep. No. 104-369 at 32 (1995). Congress enacted the PSLRA in recognition of evidence that "discovery costs account for roughly 80% of total litigation costs in securities fraud cases." S. Rep. No. 104-98, at 12 (1995). To combat this problem, the discovery stay was "designed to enable securities defendants to obtain early dismissal of frivolous class actions, and thereby avoid the high expense of discovery." *Riley v. Merrill Lynch, Pierce, Fenner & Smith*, 292 F.3d 1334, 1341 (11th Cir. 2002), abrogated on other grounds sub nom. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006). Although Office Depot felt that it could not avoid the high expense of responding to the SEC or investigating the need for a restatement due to its legal duties wholly independent of the Securities Actions, the PSLRA precludes Office Depot from transforming those costs into ones "necessary" to its defense of the federal litigation and resulting "solely" from the litigation in which no discovery took place.

> **E.    The Making of A Claim Does Not Retroactively Transform All Sums Incurred Prior to the Claim into Defense Costs.**

Office Depot admits that incurring in excess of $23 million in fees and costs for which it seeks coverage was not a "reasonable response" to the Securities and Derivative Actions alone. Howell Decl., Ex. D at 247:17-22. Instead, Office Depot asserts that the date that the Securities and Derivative Actions, the SEC's informal inquiry and the SEC's Formal Order of Investigation are considered to have been made "relates back" to its July 11, 2007 notice of circumstances "for the purpose of triggering coverage for the Defense Costs incurred by Office Depot." Am. Compl. ¶ 25. Office Depot, however, conflates the manner in which the Primary Policy defines the applicable policy year in which a Claim falls with the event that gives rise to coverage for "Defense Costs" as defined under the Primary Policy.

Section 7(c) of the Primary Policy, upon which Office Depot relies for its position, does not create coverage for matters that do not constitute Claims. Under Section 7(c), "[i]f, during

the Policy Period . . . an Organization or an Insured shall become aware of any circumstances which may reasonably be expected to give rise to a Claim," the Insured has the ability to provide written notice of such circumstances to the insurer. Statement ¶ 11. If it provides the required notice, "then a Claim which is subsequently made against such Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances shall be considered made at the time such notice of such circumstances was given." *Id*. The provision speaks solely to when a subsequent Claim is "considered made"; it does not speak to when Defense Costs are deemed incurred. Defense Costs consist of fees and costs resulting solely from the defense or investigation of a Claim, and as the *National Stock Exchange* case recognizes, a Claim must first exist before it can be defended. 2007 WL 1030293, at *6. Section 7(c) does not alter those requirements in any way.

## IV.   **CONCLUSION**

For the foregoing reasons, American Casualty respectfully requests the Court grant it partial summary judgment as to Counts I and III of Office Depot's Amended Complaint and issue the declaratory relief as set forth in American Casualty's motion.

Respectfully submitted,

By: _____

Daniel J. Standish (*pro hac vice*)
Gary P. Seligman (*pro hac vice*)
John E. Howell (*pro hac vice*)
WILEY REIN LLP
1776 K Street NW
Washington, DC  20006
TEL: 202.719.7000
FAX: 202.719.7049

BARITZ & COLMAN LLP
Neil S. Baritz
Florida Bar No. 00003468
Craig R. Glasser
Florida Bar No. 0008567
1075 Broken Sound Parkway, NW
Suite 102
Boca Raton, FL 33487
TEL: 561.864.5100
FAX: .561.864.5101

Attorneys for Defendant
AMERICAN CASUALTY COMPANY
OF READING PA

Dated: June 11, 2010

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11<u>th</u> day of June, 2010, a true and correct copy of the foregoing Memorandum of Law in Support of Defendant American Casualty Company of Reading PA's Motion for Summary Judgment is being served on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Neil S. Baritz, Esq.
Florida Bar No. 00003468
Craig R. Glasser, Esq.
Florida Bar No. 0008567
Baritz & Colman LLP
1075 Broken Sound Parkway, NW
Suite 102
Boca Raton, FL 33487
(561) 864-5100
(561) 864-5101 (facsimile)

## SERVICE LIST

Sidney A. Stubbs, Esq.
Joanne M. O'Connor, Esq.
Jones, Foster, Johnston & Stubbs, P.A.
505 South Flagler Drive, Suite 1100
P.O. Box 3475
West Palm Beach, FL 33402-3475
*Attorneys for Plaintiff*

Edmund M. Kneisel. Esq.
Brent W. Brougher, Esq.
Kilpatrick Stockton LLP
Suite 2800
1100 Peachtree Street
Atlanta, GA 30309-4528
*Attorneys for Plaintiff*

Steven J. Brodie, Esq.
Carlton Fields, P.A.
4000 International Place
100 S.E. 2nd Street
Miami, FL 33131-9101
*Attorneys for National Union Fire Insurance Company of Pittsburgh, PA.*

Gwynne A. Young, Esq.
Carlton Fields, P.A.
P.O. Box 3239
Tampa, FL 33601
*Attorneys for National Union Fire Insurance Company of Pittsburgh, PA.*