IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CIVIL ACTION NO. 09-80554-Civ-Marra/Johnson

| | |
|---|---|
| OFFICE DEPOT, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| NATIONAL UNION FIRE INSURANCE | ) |
| COMPANY OF PITTSBURGH, PA., | ) |
| | ) |
| Defendant, | ) |
| | ) |
| AMERICAN CASUALTY COMPANY | ) |
| OF READING, PA., | ) |
| | ) |
| Intervenor Defendant. | ) |

**PLAINTIFF OFFICE DEPOT, INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON INSURANCE COVERAGE AND
INCORPORATED MEMORANDUM OF LAW**

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL SUMMARY ....................................................................................... 3

III.  ARGUMENT AND CITATION OF AUTHORITY ............................................. 7

    **A.**  Summary Judgment and Standards for Construing Insurance Policies. ........... 7

    **B.**  The "Relation-Back" Wording of Section 7(c) Requires Reimbursement of All "Defense Costs" Incurred After July 11, 2007. .................................................. 8

    **C.**  The SEC Investigation Constitutes a Covered "Securities Claim." ................. 12

        **1.**  The ambiguous policy definitions should be construed to cover investigatory costs. ................................................................................. 12

        **2.**  The SEC investigation was a covered "administrative or regulatory proceeding." ......................................................................................... 13

        **3.**  The SEC simultaneously pursued proceedings against Office Depot and Insured Persons. ................................................................................... 15

    **D.**  Costs Incurred in Responding to the SEC Investigation are Related to and Benefited the Defense of the Securities Lawsuits ............................................ 17

IV.  CONCLUSION ................................................................................................... 20

US2008 1345773 5

## TABLE OF AUTHORITIES

**Cases**

*Beans v. Chohonis*,
   740 So. 2d 65 (Fla. 3d DCA 1999)...........................................................................................13

*Blue Cross & Blue Shield of Fla., Inc. v. Steck*,
   778 So. 2d 374 (Fla. 2d DCA 2001).........................................................................................13

*Crane v. Arizona Republic*,
   972 F.2d 1511 (9th Cir. 1992)..................................................................................................15

*Fayad v. Clarendon Nat'l Ins. Co.*,
   899 So. 2d 1082 (Fla. 2005) ............................................................................................. passim

*Foster v. Summit Medical Systems, Inc.*,
   610 N.W. 2d 350 (Minn. App. 2000) ......................................................................................14

*Garcia v. Federal Ins. Co.*,
   969 So. 2d 288 (Fla. 2007) .....................................................................................................13

*Hannah v. Larche*,
   363 U.S. 420 (1960) ................................................................................................................14

*Jordan v. Lakeland Regional Med. Ctr., Inc.*,
   153 F. Supp. 2d 1333 (M.D. Fla. 2001)..................................................................................13

*Joseph P. Bornstein, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
   828 F.2d 242 (4th Cir. 1987) ..................................................................................................15

*Liberty Mut. Ins. Co. v. Continental Cas. Co.*,
   771 F.2d 579 (1st Cir. 1985)...................................................................................................20

*MBIA, Inc. v. Fed. Ins. Co.*,
   No. 08 Civ. 4313 (RMB), 2009 U.S. Dist. LEXIS 124335 (S.D.N.Y. Dec. 30, 2009)..............20

*Minuteman International, Inc. v. Great American Insurance Co.*,
   No. 03 C 6067, 2004 WL 603482 (N.D. Ill. Mar. 22, 2004).........................................................14

*Muckleshoot Indian Tribe v. Washington Dep't of Ecology*,
   50 P.3d 668 (Wash. Ct. App. 2002)........................................................................................15

*Nat'l Stock Exch. v. Fed. Ins. Co.*,
   No. 06 C 1603, 2007 WL 1030293 (N.D. Ill. Mar. 30, 2007).......................................................15

*Nixon v. U.S.F.&G.*,
   290 So. 2d 26 (Fla. 1973) ...................................................................................................8, 13

US2008 1345773 5

*Pasteur Health Plan, Inc. v. Salazar,*
  658 So. 2d 543 (Fla. 3d DCA 1995)....................................................................................8

*Penzer v. Transpo. Ins. Co.,*
  29 So. 3d 1000 (Fla. 2010) .................................................................................................8

*Pepsico, Inc. v. Continental Casualty Co.,*
  640 F. Supp. 656 (S.D.N.Y. 1986) ...................................................................................19

*Polychron v. Crum & Forster Ins. Cos.,*
  916 F.2d 461 (8th Cir. 1990) ......................................................................................14, 20

*Richardson Elecs. Ltd. v. Fed. Ins. Co.,*
  120 F. Supp. 2d 698 (N.D. Ill. 2000).................................................................................15

*State Farm Fire & Cas. Co. v. CTC Dev. Corp.,*
  720 So. 2d 1072 (Fla. 1998) .............................................................................................13

*State of New York v. Blank,*
  745 F. Supp. 841 (N.D.N.Y. 1990)...................................................................................20

*Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.,*
  913 So. 2d 528 (Fla. 2005) ...........................................................................................8, 13

*Tele Tech of Connecticut Corp. v. Dep't of Pub. Util. Control,*
  855 A.2d 174 (Conn. 2004) ..............................................................................................15

*U.S. Fire Ins. Co. v. J.S.U.B., Inc.,*
  979 So. 2d 871 (Fla. 2007) ...........................................................................................8, 13

**Statutes**
18 U.S.C. § 1001...................................................................................................................5

18 U.S.C. § 1621...................................................................................................................5

**Other Authorities**
Fed. R. Civ. P. 56..............................................................................................................1, 7

Fed. R. Civ. Proc. 30............................................................................................................6

**Rules**
Barry R. Ostrager & Thomas R. Newman,
  *Handbook on Insurance Coverage Disputes* § 10.04(a) (14th ed. 2008)....................20

Black's Law Dictionary (8th ed. 2004) ..............................................................................14

The Random House Dictionary of the English Language (2d ed. 1987)...........................14

iv

Plaintiff Office Depot, Inc. ("Office Depot"), pursuant to Federal Rule of Civil Procedure 56(d)(2), respectfully submits its Motion for Partial Summary Judgment on Insurance Coverage, and Incorporated Memorandum of Law in Support.

## I.   INTRODUCTION

This is an action for declaratory relief and damages based on wrongful denial of coverage under Office Depot's 2006-2007 Directors and Officers Liability policy number 965-63-88 (the "AIG Policy") issued by defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union").[1] Since July 2007, Office Depot and its senior executives have been engaged in an extensive investigatory proceeding conducted by the Securities and Exchange Commission ("SEC"), as well as civil lawsuits addressing the same circumstances being investigated by the SEC. Office Depot took remedial measures and cooperated with the SEC, ultimately announcing in late 2009 that it had reached a proposed settlement with the SEC. In the meantime, the civil lawsuits have been dismissed with and without prejudice, subject to the outcome of a pending appeal.

National Union received timely notice of the SEC's investigation and the subsequent lawsuits; but has failed to honor its policy obligations by refusing to reimburse the more than $22 million in investigatory costs that Office Depot has incurred. Instead, National Union seeks to rewrite the AIG policy to include an express exclusion for investigatory costs that simply does not exist. National Union's erroneous position should be rejected:

- Rather than include an express exclusion for investigatory costs, the AIG Policy expressly defines "Defense Costs," to include "reasonable and necessary fees, costs and expenses... resulting solely from the *investigation*, adjustment, defense and/or appeal of a Claim against an Insured...." (emphasis added).

---

[1] Capitalized terms, as used herein, refer to the terms used in the AIG Policy, which are quoted in appropriate detail in the accompanying Statement of Material Facts, filed herewith in accordance with Local Court Rule 7.5(c) (hereinafter "Facts Stmt."). Supporting testimony, by deposition or sworn declaration, will be referenced by the witness' name.

1

- It is undisputed that covered Claims and Securities Claims (SEC subpoenas and Wells notices and civil lawsuits) have been made, but National Union purports to isolate the Defense Costs in connection with those Claims from the Defense Costs Office Depot has incurred in investigating them.[2]

- National Union ignores completely the controlling language of the "Notice of Circumstances" clause (Section 7(c)) of the AIG Policy, which provides that where, as here, notice of a potential claim has been issued by the policyholder, all subsequent Claims alleging Wrongful Acts (securities laws violations) related to the notice are deemed to have been "made" as of the date of the Notice of Circumstances (here July 11, 2007); therefore, Defense Costs incurred since then, including investigatory costs, are covered.

- National Union ignores the inherent ambiguities in the circular definitions of Claim and Securities Claim in its policy and that Office Depot's understanding that the policy should cover SEC investigatory proceedings is reasonable.

National Union could have included a clear and express exclusionary clause in the AIG Policy (such clauses appear in other similar policies) to bar coverage for any investigatory costs incurred before the date of the actual claim; but it failed to do so. Nevertheless, exalting form over substance and factual reality, National Union relies on inherently ambiguous policy language to contend that its policy actually does contain such an exclusion. This argument is easily rejected by application of the well-established cannons of policy construction under Florida law. Moreover, National Union's argument completely ignores the "relation back" language of policy clause 7(c). When construed in light of the undisputed facts, that clause should be deemed to cover Office Depot's Defense Costs incurred since the date of the Notice of Circumstances, thereby warranting entry of partial summary judgment holding that Office Depot's Defense Costs, including the investigation costs incurred since July 11, 2007, are covered and that National Union has breached the AIG Policy by refusing to reimburse or to advance any of those costs. Questions related to the quantum of recoverable Defense Costs present issues for trial. *See* Rule 56(d)(2).

---

[2] National Union contends that only a miniscule amount (less than three percent) of the Defense Costs incurred by Office Depot relate specifically to covered Claims

## II.     FACTUAL SUMMARY

In late June, 2007, a "Dow Jones Newswire" article reported that Office Depot may have improperly disclosed material information regarding projected profits and sales to certain financial analysts, perhaps in violation of the federal securities laws. (Facts Stmt. ¶10). On July 11, 2007, Office Depot promptly forwarded a Notice of Circumstances to National Union advising of a potential "Claim" or "Securities Claim." (Kleinle Dep. I Ex. 8; Neumann Dep. Ex. 1). Only six days later, the SEC commenced an investigation by sending a letter of inquiry to Office Depot, dated July 17, 2007, under SEC file no. FL-3332, which Office Depot forwarded to National Union on July 20, 2007. (Kleinle Dep. I Ex. 9). In July, 2007, Office Depot's legal department received a "whistleblower" letter regarding certain financial irregularities and promptly commenced an internal investigation. On July 31, 2007 and August 6, 2007, the SEC issued letters expanding its investigation to include, among other things, any whistleblower correspondence, inventory accounting and numerous related issues. (Kleinle Dep. I Ex. 16 at Attachments 2 & 3; Calkins Dep. at 104 (The SEC investigation included "matters relating to finance accounting, whistle blowers, and, a litany of things . . . .")). The SEC correspondence marked the beginning of an intensive investigation requiring production of more than 1,000,000 pages of files and business records, including the files of more than thirty (30) Office Depot officers, directors and employees, all of whom are "Insured Persons" under the AIG Policy. Not surprisingly, many of the individuals involved requested representation by separate, independent counsel, whose fees would be reimbursed by Office Depot pursuant to its corporate indemnity obligations.

As a result of Office Depot's internal investigation, including an investigation conducted by the independent Directors on the "Audit Committee," Office Depot publicly announced on October 29, 2007 that it was delaying the release of its third-quarter Form 10-Q and advised of

3

potential problems with vendor-rebate accounting. (Office Depot's Req. Jud. Not., Ex. 6, Form 8k 10/29/07). Shortly thereafter, on November 7, 2007, plaintiffs filed lawsuits in the Southern District of Florida alleging violations of the federal securities laws and specifically referencing the ongoing SEC investigation. (*See id.*, Exs. 1-5). These lawsuits were consolidated as *Sheet Metal Workers Local 28 Pension Fund v. Office Depot, Inc.*, *et al.*, No. 07-81038 (the "Class Action Lawsuit"); and *Mason, et al., v. Office Depot, Inc.*, *et al.*, No. 07-81059 (the "Derivative Lawsuit" and collectively with the Class Action Lawsuit, the "Securities Lawsuits"). (*See id.*). The Securities Lawsuits alleged the same financial irregularities that were being investigated by the SEC. (*See id.*; *Sheet Metal Workers Local 28 Pension Fund v. Office Depot, Inc., et al.*, No. 07-81038 [DE 74] ¶¶3-6, 10-11, 67-68, 71, 86 n.7, 139-40, 153, 155-56, 181, 183 & 198-200; *Mason, etc. v. Odland, et al.*, Case No. 07-81059-Civ-Hurley [DE 1] ¶¶26-27 & 33-38).[3]

As explained by Mr. Thomas Newkirk, formerly employed as Chief Litigation Counsel and Associate Director of the Division of Enforcement of the SEC, and as reflected by the actions taken by counsel for Office Depot and by counsel representing the Insured Persons being investigated, an SEC "letter of inquiry," even when not accompanied by a formal subpoena, is typically considered to be a mandatory investigative demand that should not be ignored. (Newkirk Dec. ¶21) (compliance with the SEC's requests is not "voluntary" from a practical perspective). The letters issued to individuals who were asked to provide documents and testimony enclosed SEC "Form 1662," accompanied when appropriate by a questionnaire

---

[3] In the Fall of 2007 and early 2008 the SEC also issued investigatory letters to counsel for the individual, Insured Persons, including Office Depot's Chief Executive Officer and Chief Financial Officer. (Facts Statement ¶18; Calkins Exs. 30, 31 & 34; OD-NU000038 to OD-NU000053; OD-NU000070 to OD-NU000087). On January 10, 2008, the SEC issued a "Formal Order of Private Investigation" to Office Depot advising that it was investigating numerous possible violations of the federal securities laws by Office Depot and its employees, officers and directors. (Facts Statement ¶21; Calkins Dep. Ex. 13).

4

requesting background information regarding the person being investigated.[4]  In the interest of

minimizing controversy and avoiding litigation (filing of an SEC enforcement action or lawsuit),

recipients of SEC investigatory letters should cooperate fully by providing the testimony and

documentation that the SEC requests.  As Mr. Newkirk testified, if a company ignores the SEC,

it "would be branded a non-cooperating company... subject to heightened charges, additional

equitable remedies, civil money penalties and added legal fees...."  (*Id.*)  Clearly, it is not a

sound or wise practice to "slam the door" in the SEC's face by refusing to cooperate with the

SEC's investigatory demands.

Also reflective of the compulsory nature of the SEC proceedings, several months after

issuance of a January, 2008 Order of Investigation using the same file number as its previous

letters, the SEC also issued subpoenas to Office Depot and to certain Insured Persons, including

several who had previously testified in response to the SEC's requests.  (Office Depot's Mot.

File Under Seal, Ex. 4).  The subpoenas, like the previous letters, were accompanied by SEC

Form 1662 and Questionnaires.  (*Id.*). Further, on November 25, 2009 and December 1, 2009,

the SEC issued "Wells Notices" to three individuals, which also included Form 1662 and a copy

of an SEC release explaining the investigative process, including the "public policy"

underpinnings of the SEC's ongoing investigatory activities. (*See id.*, Ex. 1, Kleinle Dep. II Exs.

2-4).

---

[4] Form 1662 details the Commission's authority for soliciting information and specifically
provides that the SEC may seek civil and/or criminal sanctions for contempt, fines and
imprisonment for persons who fail to supply information. *See e.g.,* Calkins Dep. Ex. 30. Form
1662 also provides that the SEC may seek other civil and/or criminal penalties, fines, and/or
imprisonment in connection with its investigation. *Id.* citing Sections 1001 and 1621 of Title 18
of the U.S. Codes.  Form 1662 also advises that the opportunity to settle with the SEC depends
upon full and truthful compliance with the SEC's investigation.

National Union has acknowledged that the Securities Lawsuits, the individual subpoenas and the Wells Notices constitute covered Claims; but National Union contends that none of the Defense Costs incurred before issuance of the subpoenas and the Wells Notices are insured and that only those legal fees allocable to the research and briefing of the Motions to Dismiss filed in the Securities Lawsuits are covered. (Kleinle Dep. I Ex. 7; Kleinle Dep. II Exs. 7 & 8). As a result, of the millions of dollars in costs and fees expended by Office Depot, National Union asserts that only $658,249.11 (about 3% of the total) is covered by the AIG Policy. (Facts Stmt. ¶27). Because this amount is less than the $2,500,000 policy retention, National Union has wrongfully and improperly refused to pay, to advance or to reimburse one penny of Office Depot's Loss.

Mr. Perry Granof, employed for most of his career as in-house counsel for the Chubb Group of Insurance Companies ("Chubb"), has reviewed the AIG Policy, in comparison with policy forms issued by Chubb and other insurers.[5] (Granof Dec. ¶¶13-19). He also has compared the AIG Policy to the recently issued, successor "Chartis form" that National Union produced during discovery and that was addressed during the corporate deposition of National Union. (*Id.* at ¶¶20-21). Unlike the clearly exclusionary language of the Chubb policy and the new Chartis form, Section 7(c) of the AIG Policy provides that after the Policyholder issues a "Notice of Circumstances" to National Union, a "**Claim** which is subsequently made against such **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging a **Wrongful Act** which is the same as or related to any **Wrongful Act**

---

[5] As explained by National Union's corporate representative during his deposition, taken pursuant to Fed. R. Civ. Proc. 30(b)(6), the AIG Policy form (no. 75010 (2/00)), originally issued in February, 2000, has remained the same and is identical to the policy form of the AIG Policy covering Office Depot and Insured Persons for the Claims at issue in this litigation. Lucullo Dep. at 11:9-13:8.

alleged or contained in such circumstances *shall be considered made at the time such notice of such circumstances was given.*" (*Id.* at ¶8) (italics added).

Because it is undisputed that Office Depot submitted a Notice of Circumstances to National Union on July 11, 2007 advising of potential Securities Claims; because it is undisputed that lawsuits alleging Securities Claims were filed on November 7, 2007; and because subpoenas and Wells Notices involving the same or related Wrongful Acts were issued by the SEC and have been acknowledged by National Union to be covered Claims, all such Claims relate back and are deemed "made" as of July 11, 2007. (*Id.* at ¶¶22-23). Accordingly, all covered Defense Costs incurred since then in excess of the retention and co-insurance clause should be paid by National Union; and National Union should "advance" future costs, as incurred, in accordance with the provisions of Section 8 at pg. 10 of the AIG Policy.

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Summary Judgment and  Standards for Construing Insurance Policies.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).   The Court is well-aware of the standards for summary judgment, which need not be restated herein.   Rather, the focus should be on the governing standards for interpretation of insurance policies under Florida law, which Office Depot respectfully submits mandate entry of partial summary judgment allowing coverage for the Securities Claim deemed to have been "made" against Office Depot as of July 11, 2007.

Under Florida law, the language of an insurance policy should be given its ordinary meaning – the meaning a reasonable person in the position of the insured would give the terms. *See Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005); *Nixon v. U.S.F.&G.*,

7

290 So. 2d 26, 29 (Fla. 1973). *See also Penzer v. Transpo. Ins. Co.*, 29 So. 3d 1000, 1005 (Fla. 2010) ("Insurance contracts are construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage.") (quoting *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007)). Insurance contracts, "as contracts of adhesion," under Florida law must be construed strictly against the insurer that drafted the policy and liberally in favor of coverage for the policyholder. *Pasteur Health Plan, Inc. v. Salazar*, 658 So. 2d 543, 545 (Fla. 3d DCA 1995). Exclusionary clauses must be construed even more strictly against the insurer than coverage provisions. *Fayad*, 899 So. 2d at 1086, *Nixon*, 290 So. 2d at 29.

An insurance carrier that relies on an ambiguous clause or clauses in its policy to deny coverage is at risk, and a policy is considered to be ambiguous where "the salient policy language is susceptible to two reasonable interpretations, one providing coverage and the other excluding coverage." *Fayad*, 899 So. 2d at 1086. Even if the insurer's interpretation of the policy is arguably "reasonable," in the case of two such reasonable interpretations, the interpretation of the policyholder in favor of coverage must be adopted. *Id. See also Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) ("If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous. An ambiguous provision is construed in favor of the insured and strictly against the drafter.") (internal punctuation omitted). Thus, the insurer bears the burden of proving its construction is the only reasonable construction of the policy. *See Nixon*, 290 So. 2d at 29-30. Further, "the insurer is held responsible for clearly setting forth what damages are excluded from coverage under the terms of the policy." *Fayad*, 899 So. 2d at 1086.

**B.    The "Relation-Back" Wording of Section 7(c) Requires Reimbursement of All "Defense Costs" Incurred After July 11, 2007.**

8

As quoted above and explained in the declaration of Perry Granof, Section 7(c) of the AIG Policy provides that after a Notice of Circumstances is submitted, any subsequent Claim alleging the same or related Wrongful Act relates back and *"shall be considered made at the time such notice of such circumstances was given."* (Granof Dec. ¶ 8) (emphasis added). All Defense Costs incurred after that date in investigating and defending the Claim are covered. As explained by Mr. Granof, other carriers have limited the scope of their "notice of circumstances" clause by expressly barring coverage for any Loss and Defense Costs, incurred before the date of the actual claim.[6] (*Id.* at ¶¶ 13-20 & Exs. B-E). Thus, if National Union wished to exclude coverage for costs incurred between the date of the Notice of Circumstances and the date the "Claim" was made, it could easily have done so.

Indeed, as explained above, the standard form of National Union's Directors & Officers policy has recently been modified by a new Chartis form to expressly exclude coverage for costs incurred prior to the date of an actual Claim. (*See id.* at ¶ 20 & Ex. E). Notably, the new Chartis form provides that a Claim that is made after submission of a "notification of circumstances" relates back to the notice date for the sole *"purpose of establishing whether such subsequent Claim was first made during the Policy Period . . . ."* (*Id.*) (emphasis added). The limited "relation back" provision of the new form is confirmed by clear language that expressly bars any coverage for Loss incurred before the date of the actual Claim: *"Coverage for **Loss** arising from any such subsequent **Claim** shall only apply to **Loss** incurred after that subsequent **Claim** is*

---

[6] Mr. Granof cites a Chubb form, which he obviously is intimately familiar with, and an ACE form, which like the new Chartis form discussed below, specifically excludes coverage for any loss and cost incurred by the Insured *before* or *prior* to the date on which the actual Claim is made. Granof Dec. ¶21. Indeed, unlike the AIG Policy, an older form of Chubb policy issued to Office Depot before the first of the series of policies issued by National Union contains an express exclusion for investigatory costs. *See note 12, infra.*

*actually made against an **Insured***." (*Id.*) (emphasis added). National Union could have readily included such language in the AIG Policy at issue in this case. It did not.

National Union's failure to include clear and unequivocal language barring coverage for pre-claim investigatory costs is fatal to its coverage position under the AIG Policy. *See* Fayad, 899 So. 2d at 1086. In *Fayad*, the insurer sought a declaration that an earth movement exclusion barred coverage for home and personal damage sustained by the insured as a result of nearby blasting activities. *Id.* at 1084. The Florida Supreme Court reversed the lower court's order granting summary judgment in favor of the insurer. *Id.* at 1089-90. The court examined case law construing earth movement exclusions, noting that certain exclusions contain "lead-in language" barring coverage for any damage from earth movement "regardless" of its cause. *Id.* at 1086-88. The policy provision in *Fayad* did not contain such language. Construing the provision against the insurer, the court held that blasting was not encompassed within the provision. The court "rel[ied] not only on the actual language used in [the insurer's] definition of earth movement, but also on the fact that [the insurer] *chose not to utilize language specifically excluding damage resulting from earth movement regardless of its cause*." *Id.* at 1089 (emphasis added). Similarly, National Union could have used language that clearly and specifically excluded pre-claim Defense Costs incurred after the date of Office Depot's notice of circumstances, but failed to do so.

Instead of excluding pre-claim costs, Section 7(c) provides that if a timely notice of circumstances is submitted, a subsequent Claim relates back so long as the Claim alleges Wrongful Acts related to the previous notice. Here, it is undisputed that the alleged Wrongful Acts underlying the Dow Jones Newswire, the ensuing SEC investigation, and the Securities Lawsuits are related. National Union has acknowledged that Office Depot's July 11, 2007

10

correspondence, as supplemented on July 20, 2007 to advise of the SEC's letter inquiring about possible violations of the federal Securities Laws, constitutes a "Notice of Circumstances" that "may reasonably be expected to give rise to a 'Claim,' within the meaning of Section 7(c) at p. 10 of the Policy." (Kleinle Dep. I at 66:14-67:18 & Ex. 11).   Shortly after commencing its investigation, the SEC expanded the investigation to include alleged irregularities or improprieties concerning Office Depot's accounting practices, financial records, financial statements, and internal controls. (Kleinle Dep. I at 166:25-168:2 & Ex. 16).  The allegations of the Securities Lawsuits filed in November, 2007 were directly related to the matters being investigated by the SEC, including Office Depot's vendor programs, accounting practices, restatement of financial earnings, and related conduct. (*See, e.g.*, Office Depot's Req. Jud. Not. at Ex. 1, *Sheet Metal Workers Local 28 Pension Fund v. Office Depot, Inc., et al.*, No. 07-81038 [DE 74] ¶¶3-6, 10-11, 67-68, 71, 86 n.7, 139-40, 153, 155-56, 181, 183 & 198-200 and at Ex. 4, *Mason, etc. v. Odland, et al.*, Case No. 07-81059-Civ-Hurley [DE 1] ¶¶26-27 & 33-38).   The same individuals named as defendants in the Securities Lawsuits (Mr. Steve Odland and/or Ms. Patricia McKay) also were subjects of the SEC investigation and eventually received subpoenas and Wells Notices that National Union acknowledged are covered Claims. (Office Depot's Req. Jud. Not. at Ex. 1-5; Office Depot's Motion to File Under Seal at Exs. 1 & 3).   This close relationship between the Notice of Circumstances, the SEC investigation, and the Securities Lawsuits also is reflected by documents in American Casualty's claims file.[7]

_____

[7] Intervenor American Casualty's claims file confirms the "relatedness" of the claims. After the SEC expanded the scope of its investigation to include "vendor rebate" issues and commenced a "formal investigation," American Casualty merged its separate files into a single file, "LC-001425." Deposition of Elizabeth A. Neumann 85:6-87:6 & Ex. 16. Ms. Neumann, the corporate representative of American Casualty, testified that this change was made because the SEC investigation concerned the same conduct that had been identified and was at issue in the Securities Lawsuits. *Id.* Ex. 15; 85:6-87:6; *see also* Neumann Exs. 10, 13 & 16.

Applying the canons of policy construction summarized above, Office Depot's interpretation of the Notice of Circumstances relation back wording is reasonable and should be accepted. Accordingly, Office Depot's motion for summary judgment on the relation back issue should be granted. *Fayad*, 899 So. 2d at 1088.

    C.    **The SEC Investigation Constitutes a Covered "Securities Claim."**

        1.    **The ambiguous policy definitions should be construed to cover investigatory costs.**

There is no reason to proceed beyond the issue of "relation back" in connection with coverage for the Defense Costs at issue; however, in the alternative, Office Depot also submits that the ambiguous, ill-defined terminology "Securities Claim" also supports Office Depot's coverage claim. The definition of Securities Claim in Section 2(y) of the AIG Policy provides:

> (y) **"Securities Claim"** means a **Claim**, <u>other than an administrative or regulatory proceeding</u> against, or investigation of an Organization, made against any Insured:
>
> > (1) <u>alleging a violation of any federal... regulation, rule or statute regulating securities</u> (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities)....
>
> ***
>
> <u>Notwithstanding the foregoing, the term **"Securities Claim"** shall include an administrative or regulatory proceeding brought against an **Organization**, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**</u>. (emphasis added).

This definition incorporates the definition of Claim, which in turn expressly incorporates ("shall include") the definition of Securities Claim. (Kleinle Dep. I at 69-70). Thus, the definitions are completely circular and Office Depot submits, hopelessly ambiguous. Indeed, it is unclear whether the circularity of the definitions is intended to broaden or to narrow the scope of coverage for Securities Claims. For example, the "Claim" definition begins by referring to demands for "monetary, non-monetary or injunctive relief." National Union's witness and

12

corporate representative, Reed Kleinle, Esq., could not explain what a claim for "non-monetary" relief other than injunctive relief might be. (*Id.* at 28-30). If the person responsible for determining coverage cannot explain the meaning of the policy, who can? Certainly, Office Depot could reasonably interpret the circular clauses to include a "non-monetary" demand made as part of an administrative or regulatory investigation that should trigger a right to recover Defense Costs incurred in providing voluminous documents and testimony in response to the SEC's investigatory (non-monetary) demands.

Where, as here, "salient policy language is susceptible to two reasonable interpretations, one providing coverage and the other excluding coverage, the policy is considered ambiguous." *Fayad*, 899 So. 2d at 1086. Such ambiguity must be construed strictly against National Union as the drafter of the AIG Policy. *Id.* Office Depot's reasonable interpretation of the policy should be adopted by allowing coverage for the costs of the SEC's investigatory proceedings. *Id. See Jordan v. Lakeland Regional Med. Ctr., Inc.*, 153 F. Supp. 2d 1333, 1336-37 (M.D. Fla. 2001) (language in an insurance policy should be given the same meaning that the insured would reasonably give it and contracts of insurance should be construed against the insurer, and in favor of the insured).[8]

### 2.    The SEC investigation was a covered "administrative or regulatory proceeding."

In addition to the canons of policy construction summarized above, it also is well settled that, "[w]hen interpreting insurance contracts, [courts] may consult references commonly relied upon to supply the accepted meanings of words." *Garcia v. Federal Ins. Co.*, 969 So. 2d 288, 291-92 (Fla. 2007); *Beans v. Chohonis*, 740 So. 2d 65, 67 (Fla. 3d DCA 1999) ("One looks to the

---

[8] See also *U.S. Fire Ins. Co. v. J.S.U.B. Inc.*, 979 So. 2d at 877; *Taurus Holdings*, 913 So. 2d at 532; *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998); *Nixon*, 290 So. 2d at 29; *Blue Cross & Blue Shield of Fla., Inc. v. Steck*, 778 So. 2d 374, 376 (Fla. 2d DCA 2001).

dictionary for the plain and ordinary meaning of words."). Black's Law Dictionary (8th ed. 2004) defines "administrative proceeding" to include a "hearing, *inquiry, investigation,* or trial before an administrative agency, usu. adjudicatory in nature but sometimes quasi-legislative" (emphasis added). The Random House Dictionary of the English Language (2d ed. 1987) defines "proceedings" as "2. a series of activities or events; happenings . . . . 5a. the instituting or carrying on of an action at law. b. a legal step or measure." The SEC's investigation qualifies as an administrative or regulatory proceeding because the SEC conducted an inquiry, investigation, and series of activities and events as part of the legal steps taken pursuant to laws and regulations allowing the SEC to investigate and remedy securities law violations. *See Hannah v. Larche*, 363 U.S. 420, 446-48 (1960) (comparing two separate forms of SEC regulatory proceedings – "investigatory proceedings" and "adjudicative proceedings" – for purposes of Due Process). Indeed, some carriers have conceded this point. *See also Minuteman International, Inc. v. Great American Insurance Co.*, No. 03 C 6067, 2004 WL 603482 at *4 (N.D. Ill. Mar. 22, 2004) ("Defendant [insurer] does not dispute that the SEC proceeding met the requirement of being . . . an 'administrative . . . proceeding'"); *Foster v. Summit Medical Systems, Inc.*, 610 N.W. 2d 350, 354 (Minn. App. 2000) ("The parties agree that the SEC investigation is an administrative proceeding . . . ").

Numerous other courts have ruled that various types of governmental investigations are covered proceedings. *See, e.g., Polychron v. Crum & Forster Ins. Cos.*, 916 F.2d 461, 463 (8th Cir. 1990) (holding that the mere fact of investigation was sufficient to create a claim and rejecting insurer's argument that under D&O policy a claim would only exist if the grand jury indicted the officer after being investigated; insurer's characterization of the investigation as mere requests for information "underestimates the seriousness of such a probe"); *Joseph P.*

14

*Bornstein, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 828 F.2d 242, 244 (4th Cir. 1987) (Justice Department grand jury investigation and subsequent indictment for tax law violations was "a proceeding . . . brought by any government regulatory agency seeking nonpecuniary relief;" court reasoned that the policyholder's reasonable interpretation prevailed over the reasonable interpretation of the insurer); *Nat'l Stock Exch. v. Fed. Ins. Co.*, No. 06 C 1603, 2007 WL 1030293, at *3 (N.D. Ill. Mar. 30, 2007) (an investigation launched by the SEC was an "administrative or regulatory proceeding"); *Richardson Elecs. Ltd. v. Fed. Ins. Co.*, 120 F. Supp. 2d 698, 701 (N.D. Ill. 2000) (finding that a DOJ investigation constituted a claim because the officers and directors were required to comply with various demands for testimony and the production of documents).[9]   Consistent with these authorities, Office Depot has reasonably interpreted its policy to provide coverage for investigating Defense Costs under the circumstances of this case.

### 3.     The SEC simultaneously pursued proceedings against Office Depot and Insured Persons.

An "administrative or regulatory proceeding" is excepted from first sentence in the definition of Securities Claim, but full coverage is restored by the final paragraph of the definition if "such proceeding is also commenced and continuously maintained against an Insured Person."   There is no dispute that simultaneous investigatory proceedings were commenced as early as July 31, 2007, when the SEC advised that Office Depot must preserve all the records of numerous employees and officers who are Insured Persons, as defined in the AIG

---

[9] *See also Crane v. Arizona Republic*, 972 F.2d 1511, 1518 (9th Cir. 1992) (collecting cases in which various government investigations were considered a "public official proceeding" for purposes of California's reporter privilege); *Tele Tech of Connecticut Corp. v. Dep't of Pub. Util. Control*, 855 A.2d 174, 185 (Conn. 2004) (holding that letter informing company of a state agency investigation constituted "institution of agency proceedings"); *Muckleshoot Indian Tribe v. Washington Dep't of Ecology*, 50 P.3d 668, 677 (Wash. Ct. App. 2002) (holding that plain meaning of term "agency proceeding" includes "any agency action," including negotiating of contract, and not just "formal, adjudicative processes").

US2008 1345773 5

policy.[10]  Other than commenting that an SEC complaint filed in federal court might qualify, Mr. Kleinle could not describe what else might constitute an "administrative or regulatory proceeding by the SEC." (Kleinle Dep. I at 75-76, 80-81). Office Depot submits that the facts establish that "such proceedings" were commenced simultaneously and continuously maintained against Office Depot and against Insured Persons for purposes of establishing coverage in this case.

Following issuance of lengthy investigatory letters to Office Depot in July and August, in the fall of 2007, the SEC sent separate letters to counsel for Insured Persons confirming their agreement to provide testimony in response to the SEC's requests. Not long thereafter, on January 10, 2008, the SEC issued a formal Order of Investigation to Office Depot, advising of potential violation of the securities laws by Office Depot and by its officers, directors and employees. National Union apparently contends that Office Depot and the Insured Persons subject to the SEC's inquiries should have "slammed the door" in the SEC's face by (a) refusing to cooperate and (b) insisting that the SEC must issue formal subpoenas compelling them to appear. Such obstructive conduct clearly is not in the best interest of a public company, such as Office Depot, or in the interest of its officers, directors and employees who may be the subjects of the SEC's investigation. Additionally, neither National Union nor American Casualty ever advised Office Depot that it should cease cooperating with the SEC and insist instead on issuance of formal subpoenas. (Calkins Dep. at 177-78). Thus, the contention that only the issuance of subpoenas should trigger any coverage is contrary to public policy, the law, and common sense. Rather, the proper approach is to cooperate with the SEC's investigatory demands, followed by negotiations that hopefully can lead to a favorable settlement, without

---

[10] The SEC's July 31, 2007 letter identified more than (30) Office Depot officers, directors and employees, including Office Depot's CEO and Chairman of the Board, and other high-ranking executives, as being subjects of the investigation. The CEO and former CFO subsequently received Wells Notices, acknowledged by National Union to be covered Claims.

16

forcing the SEC to commence a federal court lawsuit or make even harsher demands. (*Id.; see* Newkirk Dec. ¶¶17-22).

The lengthy proceedings commenced by SEC, including the SEC's formal Order of Investigation, constitute more than a routine, preliminary investigation, which Mr. Newkirk described as a "Matter Under Investigation" or "MUI." (Newkirk Dec. ¶8). The three years of investigatory activities undertaken by the SEC, culminating in a settlement in principle of alleged Securities Law violations, constitute covered "proceedings" under the AIG Policy. (*See* Granof Dec. ¶11). However, despite years of work by multiple defense counsel, including assembly and production of more than 1,000,000 pages of materials for the SEC, culminating (following completion of numerous depositions) in a settlement, National Union still contends that not one penny of Office Depot's investigatory costs are insured. Office Depot's actions (cooperating with the SEC rather than forcing litigation or a formal enforcement proceeding) arguably saved Office Depot's insurance carriers millions of dollars in covered Loss. (*Id.*)

The foregoing cases support Office Depot's reasonable interpretation of the undefined phrase, "regulatory or administrative proceeding." Under the facts of this case, the AIG Policy should be construed in favor of coverage, to include the costs incurred in connection with the SEC investigation, which has culminated in an announced settlement that is consistent with the public interest. The costs of accomplishing that end should be fully insured.

### D.    Costs Incurred in Responding to the SEC Investigation are Related to and Benefited the Defense of the Securities Lawsuits

National Union effectively contends that neither Office Depot nor the Insured Persons who were subjects of the consolidated Securities Lawsuits were entitled to conduct a factual investigation of the claims alleged or to gather documents and preserve any evidence and testimony that could be used in defending against those claims. The derivative claims were

17

dismissed without prejudice; and the consolidated Securities Class Actions were eventually dismissed with prejudice; however, Judge Hurley's dismissal ruling is currently on appeal. Similarly the SEC proceedings have not finally concluded. National Union's contention that none of the related costs of investigation incurred in connection with these overlapping proceedings are reimbursable because the Securities Lawsuits have been dismissed is inconsistent with the reality of modern litigation and the plain language of the AIG Policy. As noted above, the AIG policy defines Defense Costs to include the reasonable costs, including attorneys' fees, of an *investigation . . . [and] defense* . . . of a Claim against an Insured . . . ." (Kleinle Dep. I. Ex. 1 at Policy, Section 2(f)) (emphasis added). Costs of investigation often are incurred before a complaint is filed and are commonly incurred before the issuance of formal subpoenas by the SEC. As explained by Mr. Newkirk, cooperation with the SEC is the best way to avoid even more serious litigation and expense.

Office Depot's Vice President and Deputy General Counsel has testified that the actions taken in response to the SEC investigatory proceedings were in the best interests of Office Depot, National Union, and the Insured Persons involved. (Calkins Dep. at 175:24-176:23). In defending the Claims and potential Claims arising from the matters being investigated, there was considerable "overlap between the class-action lawsuits and . . . the matters which were set forth in the [SEC] investigation." (*Id.* at 127:4-127:14; 128:15-128:25). Because the "information and documents Office Depot collected and produced in response to the SEC investigation …[also] pertained to allegations generally that were pled in the securities litigation,… the work product, as it relates to those documents, certainly was used by defense counsel [in the Securities Lawsuits.]" (*Id.* at 102:19-103:3105:2-105:7).

In *Pepsico, Inc. v. Continental Casualty Co*, securities lawsuits were filed against Pepsico, its officers and directors, and its accounting firm. 640 F. Supp. 656 (S.D.N.Y. 1986), *disagreed with on other grounds by, Waltuch v. Conticommodity Servs., Inc.*, 88 F.3d 87, 92 n.8 (2d Cir. 1996). Like Office Depot, Pepsico had to restate its financials due to a series of accounting irregularities. The SEC also initiated an investigation regarding the restated earnings. Pepsico subsequently settled the class-action lawsuit and then sued its D&O insurer, seeking reimbursement of the settlement and defense costs. *Id.* at 657-58. The court considered whether the carrier had a duty contemporaneously to pay the officers' and directors' costs of defending the class action, as well as the costs of responding to the SEC investigation. *Id.* at 658-59, 666. The court ruled that the carrier had to pay the litigation defense costs and the costs incurred in connection with the SEC investigation:

> Because the litigation and the investigations were each directed at the same allegedly fraudulent activity, were directed against both Pepsico and its directors and officers, it would seem that these defense costs, like the costs of defending the class action, are properly the subject of indemnification, and therefore a covered loss within the policy. *Id.* at 666.[11]

Absent an express exclusion to the contrary (which is lacking in the Office Depot policy), an insured is entitled to conduct a reasonable investigation as part of its defense of a Claim.[12] As a result, investigative costs to determine (and defend against) potential liability are covered by a

---

[11] Pepsico did not have organization coverage and hence was not an Insured; therefore, the court allowed the carrier to distinguish between Pepsico's own, uninsured costs and the covered investigatory costs attributable to the defense of Pepsico's officers and directors, who were Insureds. *Pepsico*, 640 F. Supp. at 666. The AIG Policy, unlike the policy at issue in *Pepsico*, fully insures Office Depot's "Organizational Liability" arising from a "Securities Claim."

[12] Mr. Granof focused on language of the notice of circumstances clauses barring coverage for pre-claim costs. However, it should be noted that the Chubb policy issued to Office Depot in 2000, immediately before National Union issued its first such policy to Office Depot, contains an endorsement that expressly excludes from the definition of an insured Loss "any amount incurred . . in connection with the investigation or evaluation of any Claim or Potential Claim by or on behalf of the Insured Organization." Schroeder Dec. ¶4, Ex. A. There is no similar exclusion in the AIG Policy. *Id.*

D&O policy. *See* Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 10.04(a) (14th ed. 2008). *See also Polychron*, 916 F.2d at 463 (fees incurred in connection with pre-indictment grand jury proceedings "were reasonably incurred in 'defense of . . . claims' under the loss provision of the policy") (ellipsis in original); *Liberty Mut. Ins. Co. v. Continental Cas. Co.*, 771 F.2d 579, 586 (1st Cir. 1985) ("pre-suit services were correctly considered as part and parcel of the defense against the liability suits"); *MBIA, Inc. v. Fed. Ins. Co.*, No. 08 Civ. 4313 (RMB), 2009 U.S. Dist. LEXIS 124335, at *27-29 (S.D.N.Y. Dec. 30, 2009) (costs incurred by a special litigation committee convened to conduct an internal investigation benefited the defense of shareholder litigation); *State of New York v. Blank*, 745 F. Supp. 841, 852 (N.D.N.Y. 1990)(an insurer is obligated to reimburse "all defense costs... incurred... which are useful in defending against the first-party complaint. . . . Common sense argues that [the insurer] is *benefited* by the early actions taken by [the insured] to defend this action."). The rulings in these cases should apply equally here.

## IV.    CONCLUSION.

Unlike other D&O policies, the AIG Policy at issue does not contain any provisions excluding coverage for investigatory defense costs; any provisions limiting the scope of the "relation back" clause in the Notice of Circumstances provision; or any provisions barring coverage for Defense Costs incurred before the Claims that relate back were actually made. Accordingly, Office Depot respectfully submits that the Court should grant its Motion for Partial Summary Judgment by ruling that Office Depot's Defense Costs, including the investigatory costs incurred after July 11, 2007, are covered by the AIG Policy.

By:   **/s/ Joanne M. O'Connor**
Joanne M. O'Connor, Esq.
Florida Bar No: 0498807
E-mail: joconnor@jones-foster.com
JONES, FOSTER, JOHNSTON & STUBBS, P.A.
505 South Flagler Drive; Suite 1100
P.O. Box 3475
West Palm Beach FL 33402-3475
Telephone: (561) 659-3000
Facsimile: (561) 832-1454
*Attorneys for Plaintiff*

OF COUNSEL:
Edmund M. Kneisel
ekneisel@kilpatrickstockton.com
Georgia Bar No: 425350
Brent W. Brougher
bbrougher@kilpatrickstockton.com
Georgia Bar No: 086373
Kilpatrick Stockton , LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
404-815-6500 (telephone)
404-815-6555 (facsimile)

## CERTIFICATE OF SERVICE

     I hereby certify that on June 11, 2010, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

By:   **/s/ Joanne M. O'Connor**
Joanne M. O'Connor

21

US2008 1345773 5

## SERVICE LIST
### Office Depot, Inc. v National Union Fire Insurance Company of Pittsburgh, PA
### CASE NO.: 09-CV-80554-MARRA/JOHNSON
### United States District Court, Southern District of Florida

Steven J. Brodie, Esquire
Email: sbrodie@carltonfields.com
Gwynne A. Young, Esquire
Email: gyoung@carltonfields.com
CARLTON FIELDS
100 S.E. 2nd Street
Suite 4000, International Place
Miami, Florida 33131
Telephone:      305-530-0050
Facsimile:      305-530-0055
*Attorneys for Defendant*


Neil S. Baritz, Esquire
nbaritz@baritzcolman.com
Craig R. Glasser, Esquire
cglasser@baritzcolman.com
BARITZ & COLMAN LLP
1075 Broken Sound Parkway, NW
Suite 102
Boca Raton, FL 33487
Telephone:      561-864-5100
Facsimile:      561-864-5101
*Attorneys for American Casualty*

Daniel J. Standish, Esquire
Gary P. Seligman, Esquire
gseligman@wileyrein.com
John E. Howell, Esquire
jhowell@wileyrein.com
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Telephone:      202-719-7000
Facsimile:      202-719-7049
*Attorneys for American Casualty*

P:\DOCS\23658\00003\PLD\1867713 DOC

22

US2008 1345773 5