# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

OFFICE DEPOT, INC.,                         )
                                            )
          Plaintiff,                        )
                                            )
     vs.                                    )     CIVIL ACTION FILE
                                            )     NO. 09-80554-Civ-Marra/Johnson
NATIONAL UNION FIRE INSURANCE               )
COMPANY OF PITTSBURGH, PA.,                 )
                                            )
          Defendant,                        )
                                            )
AMERICAN CASUALTY COMPANY                   )
OF READING, PA.,                            )
                                            )
          Intervenor Defendant.             )
_____

### Declaration of Perry S. Granof

1. My name is Perry Stuart Granof. I am currently the Managing Director of Granof International Group LLC, in Chicago, Illinois, and Of Counsel to the Williams Kastner law firm in Seattle, Washington. This declaration is based on my personal knowledge of the materials referenced herein and on my knowledge and experience in the insurance industry.

2. I have worked in the insurance claims industry for over 30 years, and in particular handled directors' and officers' liability (D&O) and related product claims. While employed in the insurance claims industry, I worked for Chubb & Son for approximately 19 years in the Specialty Claims Department as a Claims Counsel, which was a senior technical position. While serving as Claims Counsel I was promoted three times, first to the position of "Senior Claims Officer", next to the position of "Assistant Vice President" and finally to the position of "Vice President". During my tenure at Chubb and in the insurance claims industry in general, I handled scores if not hundreds of directors and officers and complex commercial liability claims.

1

3. I have been asked to provide this declaration and expert opinion regarding coverage under a Directors and Officers liability policy No. 965-63-88 issued to Office Depot, Inc. by National Union Fires Insurance Company of Pittsburgh, Pa., ("NU") a subsidiary of the American International Group, covering "claims made" for "Wrongful Acts," including, but not limited to, acts that allegedly violated the federal Securities Laws ("AIG Policy"). The AIG Policy that I reviewed is attached as Exhibit A to Office Depot's Complaint.

4. The AIG policy at issue has four insuring clauses, only one of which, entitled **Organization Insurance**, is at issue in this case. This coverage provides direct coverage to the corporate entity (Office Depot) in two instances, one, in the event of a "Securities Claim" against Office Depot and two, covering Office Depot's costs in indemnifying an "Insured Person" against "Loss," including "Defense Costs," incurred as a result of a "Claim," which is defined to include a "Securities Claim" against an "Insured Person." Office Depot seeks to recover the costs it has incurred in defending against and investigating "Securities Claims" against Office Depot and in indemnifying Insured Persons for the defenses costs they incurred in defending against and investigating Securities Claims against them.

5. For purposes of this Declaration, my review has focused on the language of the governing AIG Policy and what I believe are the key events and correspondence underlying this matter, which are summarized in Exhibit "A" hereto.

6. A D&O policy typically has two or more Insuring Clauses, which set forth the parameters, whereby coverage is provided to corporate directors, officers, and at times employees and the company itself. The Insuring Clauses typically contain several defined terms, often printed in bold, which clarify the scope of coverage offered by the insuring clauses. Coverage is further limited, arguably to a lesser degree by the exclusions, which are often

2

bifurcated or divided further based upon the Insuring Clauses available.

      7. The salient facts derived from the materials I have reviewed and that I have relied upon for purposes of this Declaration include the following:

      (a) There is no dispute that "If (an) insured is subpoenaed, the subpoena may constitute a claim," as stated in Reed Klienle's 2/13/08 letter to Lynn Mirabella of ARC and as amplified by his letter of August 11, 2008, in which he stated that that coverage may be available for an SEC subpoena or "inquiry;"

      (b) Starting in the fall of 2007, the SEC issued investigatory letters to at least 6 directors and officers of OD who are Insured Persons;

      (c) On January 10, 2009, the SEC issued a formal **"Order Directing Private Investigation and Designating Officers to Take Testimony"**;

      (d) On July 17, 2008 the first of a series of *subpoena duces tecum's* issued pursuant to the SEC's "Formal Order of Private Investigation," including subpoenas (acknowledged by NU to be "Claims") issued to employees, officers and/or directors of OD;

      (e) During 2009, the SEC issued investigatory subpoenas *ad testificandum and dues tecum* to Stephen Odland and Patricia McKay who had been named as defendants in the November, 2007 Securities Lawsuits;

      (f) In late, 2009, the SEC issued Wells Notices to Mr. Odland, Ms. Mckay, and Mr. Ray Tharpe, all of whom are Insured Persons under the AIG Policy; and

      (g) As acknowledged by NU and in accord with the definition of **"Claim"**, the subpoenas and Wells Notices constitute a **"Claim"** for alleged violation of the Securities Laws against Insured Persons for purposes of Office Depot's indemnification coverage.

3

8. Once a "Claim," including a "Securities Claim" has been made, the **"Notices/Claims Reporting Provisions"** of the AIG Policy should trigger coverage for Defense Costs of both the Organization and for the Organization's costs of indemnifying Insured Persons in light of the plain language of Clause 7 (c). Pursuant to this clause, after issuance of a Notice of Circumstances, any subsequent "Claim" that is related to the circumstances or "Wrongful Act" previously reported relates back and is deemed to have been "made" as of the date of the notice of circumstances:

> "(c) "If during the Policy Period or the Discovery Period (if applicable) an **Organization** or an **Insured** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall give written notice to the Insurer of the circumstances, …then a **Claim** which is subsequently made against such Insured and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged or contained in such circumstances, shall be considered made at the times such notice of such circumstances was given." AIG Policy §7(c)(emphasis added).

9. The two shareholder derivative lawsuits and two US securities class actions that were filed against Office Depot and certain directors and officers in November 2007 are covered **"Securities Claims,"** as acknowledged by NU. To the extent they arise from the same circumstances or are related to any "Wrongful Acts," including **"any violations of the federal securities laws"**, reported in Office Depot's Notice(s) of Circumstances, these **"Securities Claims"** are deemed to have been "made" when the notice was originally conveyed to NU (July 11 2007). In his letter dated August 22, 2007, Mr. Klienle accepted the July 11, 2007 letter and e-mail of July 20, 2007 forwarding the July 17, 2007 SEC letter of inquiry as a valid Notice of Circumstances.

10. To the extent that a **Formal Order** was issued by the Securities and Exchange Commission, on January 10, 2008 and captioned as "In the matter of Office Depot, Inc., File No.

4

FL-03332", and to the extent a settlement resulted from the proceedings that were commenced and continuously maintained against OD and Insured Persons since then, the costs incurred would relate back to the original Notice of Circumstances. Thus, under Clause 7(c) of the AIG Policy, the December 4, 2009 announced settlement between the SEC and OD was in effect a settlement of a "**Securities Claim**" against the Organization that also should relate back to the date of the original Notice of Circumstances tendered on July 11, 2007.

11. I understand that National Union contends that the AIG Policy differentiates between "investigation(s)" and "administrative or regulatory proceedings," as contained in the definition of "Securities Claim," but this terminology is not otherwise defined in the policy. To the extent the SEC investigation resulted in a settlement, the nature of the proceeding before the SEC, including, but not limited to the proceedings commenced after the issuance of the formal Order of Investigation, had to constitute something more than a routine investigation. Indeed, had a settlement not been reached, the SEC would have likely filed a lawsuit or another form of enforcement action, which would have unquestionably constituted a "proceeding" under the policy and would have had the consequences of increasing the amount of defense costs which NU would have otherwise been obligated to pay. By cooperating with the SEC's investigation, which I understand involved substantial testimony and the production of more than one million pages of documents, leading eventually to a settlement, OD arguably saved NU millions of dollars in defense and or liability costs that would have been reimbursed under the AIG Policy.

12. In accord with my previous experience with similar policies, I have knowledge that other carriers, including my former employer, Chubb, have issued policies that specifically address the relation back issue addressed here, but that clearly and expressly limit and exclude coverage for pre-Claim costs and expenses, including the costs of investigating a potential claim.

5

NU certainly had the ability to look at the policy wording used by other carriers and to incorporate language in the AIG Policy to exclude, by clear and unambiguous language, coverage for any Defense Costs incurred before the date of the actual claim.  Despite the absence of such language, NU contends that only those costs incurred after a Claim is made and that are specifically related solely to costs of dealing with that claim (such as a subpoena to an Insured Person) are covered.  National Union's position is contradicted by the language of Section 7(c) quoted above and by the language of the "Advancement of Fees" clause of the AIG policy, which does not appear to permit such allocation.

13.  For example, most D&O policies that I have come across use wording in the Notice of Circumstances provision of the policy which provides that if a proper notice of Circumstances is given and a Claim results from the facts described in the Notice of Circumstances, the Claim will be treated as Claim made in the "Policy Year" such "Notice of Circumstances" was given. For Example, the "Executive Protection Portfolio", offered by the "Chubb Group of Insurance Companies", which I am familiar with in my former position with Chubb, provides under the "Reporting and Notice" provision of the "Executive liability and Entity Securities Liability Coverage Section" that:

> (b) If during the **Policy Period** an **Insured**:
> (i) becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the Company;
> (ii) receives a written request to toll or waive a statute of limitations applicable to **Wrongful Acts** committed, attempted, or allegedly committed or attempted before or during the **Policy Period** and gives written notice of such request and of such alleged **Wrongful Acts** to the Company; or
> (iii) gives written notice to the Company of a **Securityholder Derivative Demand**.
>
> Then any **Claim** subsequently arising from the circumstances referred to in (i) above, from the **Wrongful Acts** referred to in (ii) above, or from the **Securityholder Derivative Demand** referred to in (iii) above, <u>shall be deemed to have been first made during the **Policy Period** in which the written notice</u>

US2008 1340231 3

described in (i), (ii) or (iii) above was first given by an **Insured** to the company, provided any such subsequent **Claim** is reported to the company as set forth in Subsection 15(a) above. With respect to any such subsequent **Claim**, no coverage under the coverage section shall apply to loss incurred prior to the date such subsequent **Claim** is actually made (emphasis added).
C32837 (Ed.11/2002)                    Catalog No. 14-02-7413

Pertinent excerpts of the Chubb Policy are attached as Exhibit "B."

14. The intent of this language is to place the "**Claim**" within the "Policy Year" in which "Notice" was first given. Moreover, the above-quoted policy provision clearly and specifically provides that no costs incurred prior to the date of the actual claim shall be covered. Thus, it is clear and unambiguous that no coverage would be available under the Chubb "Executive Protection Portfolio" for any fees incurred by Office Depot or any Insured Persons before those persons were named in a lawsuit or before the date of any other actual "Claim" for violation of the Securities Laws.

15. Similarly, the CODA Premier, "Directors and Officers Liability" policy, as featured in the book Liability of Corporate Officers and Directors, Seventh Edition, by William E. Knepper and Dan Bailey, volume 2, includes a Notice of Circumstances provisions, which states in relevant part:

14. Loss Provision...

If during the Policy period or the Discovery Period if elected pursuant to Clause 22 below), the Insureds or the Company shall become aware of any circumstances that are likely to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating a Claim, with particulars as to dates and persons involved, then any Claim that is subsequently made against the Insureds arising out of such circumstances shall be treated as a Claim made during the first Policy Year in which the Insured or the Company gave such notice (emphasis added).
CODA Premier                                  04 ED 03/04

Pertinent excerpts of the CODA Premier Policy are attached as Exhibit "C."

7

16. The CODA Premier Policy treats any Claim arising from Notice of Circumstances as falling within the Policy Year in which notice was tendered. The CODA policy does not expressly exclude costs incurred prior to the date of an actual claim being filed, but the "policy year" limitation provides a much stronger basis for arguing that the costs of investigating the potential claims underlying the Notice of Circumstances are not covered. The applicable NU language contains no such limitation, but rather provides that the date on which the claim is deemed "made" coincides with the date of the previous Notice of Circumstances.

17. The ACE Advantage Corporate Directors' & Officers' Liability Policy treats Notice of Circumstances in a manner similar to the AIG policy, but with an important, clarifying caveat at the end:

IX.     NOTICE
   A.  The **Insureds** shall, as a condition precedent to their rights under this **Policy**, give to the **Insurer** written notice of any **Claim** made against the **Insureds** as soon as practicable, but in no event later than the termination of the **Policy Period** or, if elected, the **Extended Reporting Period**.
   B.  If, during the **Policy Period**, the **Insureds** first become aware of facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds** give written notice to the **Insurer** during the **Policy Period** of:
   1.  the identity of the potential claimants;
   2.  a description of the anticipated **Wrongful Act** allegations;
   3.  the identity of the **Insureds** allegedly involved;
   4.  the circumstances by which the **Insureds** first became aware of the facts or circumstances;
   5.  the consequences which have resulted or may result; and
   6.  the nature of the potential monetary damages and non-monetary relief;
       then any **Claim** which arises out of such **Wrongful Act** shall be deemed to have been first made at the time such written notice was received by the **Insurer**. <u>No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**</u> (emphasis added).
       PF-14759 (9/03)

Pertinent excerpts of the ACE policy are attached as Exhibit "D."

18.  The language in the ACE Advantage form more closely resembles the NU form in that it treats Claims arising from Notice of Circumstances as relating back to the carrier's receipt of the Notice of Circumstances.  However, unlike the NU form, it expressly precludes coverage for any costs incurred prior to the actual manifestation of a Claim.  In that sense, it is similar to the Chubb, "Executive Protection Portfolio" policy, quoted above by clearly barring coverage for pre-Claim costs.

19.  In contrast to the foregoing examples, the language of the AIG Policy does not contain any limitation or exclusion precluding coverage for **Defense Costs** incurred prior to the submission of the Claim.  Rather, the date on which such claim is deemed to have been "made" is designated to be the date of the previous Notice of Circumstances.  Thus, the policy in effect on the date of the Notice of Circumstances, which is the date the claim is deemed to have been "made," governs.

20.  Chartis, as the successor to NU, issued recently its "Executive Edge" Directors and Officers liability form, which is billed as a "New Generation D&O Policy for Public Companies".  Under Clause 7, the "Notice and Reporting" provision of this policy, the subpart entitled "Relation Back to Reported Circumstances Which May Give Rise to a Claim" provides in relevant part:

> [A]ny **Claim** that is subsequently made against an **Insured** that arises from such circumstances and that is reported in accordance with Clause 7(a) above shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent **Claim** was first made during the **Policy Period** or during the **Discovery Period** (if applicable). <u>Coverage for **Loss** arising from any such subsequent **Claim** shall only apply to **Loss** incurred after that subsequent **Claim** is actually made against an **Insured.**</u> (emphasis added).

9

Pertinent excerpts of the Chartis form are attached hereto as Exhibit "E." This new form recognizes the implications of the policy wording of the previous NU form that does not contain the express exclusion for pre-Claim Loss highlighted above.

21. The Notice of Circumstances clause and the definitions of "Loss" and "Defense Costs" of the applicable AIG Policy differ significantly from the definition of "Loss" and the "Circumstances" clause in the Chubb policy attached hereto as Exhibit "B," which bars any coverage for the costs of investigation incurred before the date of the "subsequent Claim"; the language of the "Notice" clause, subparagraph IX.B.6 of the ACE policy attached as Exhibit "D," which bars coverage for any costs incurred "prior" to the time the Wrongful Act reported "results in a claim"; and the "Relation Back to Reported Circumstances" clause of the successor Chartis policy attached as Exhibit "E," which bars coverage for any "Loss," including the costs of investigation incorporated in the policy's definition of "Defense Costs," before the "subsequent Claim is actually made." No similar language in the AIG Policy at issue in this case bars retroactive coverage for Office Depot's "Loss."

22. In my opinion, based on review of the matters summarized herein and my more than thirty (30) years of experience in addressing these issues, the SEC's investigation and the pending settlement between Office Depot and the SEC clearly relate to matters that have been the subject of the SEC's formal Order of Investigation issued on January 8, 2008 and hence should be deemed a "proceeding," which proceeding included issuance of subpoenas and Wells Notices to individual, "Insured Persons" that have been acknowledged by NU to be covered claims. The SEC's investigation and the pending settlement also clearly relate to matters alleged in the Securities Lawsuits filed in November, 2007, which also are undisputedly covered "Claims." All such matters are related to alleged "Wrongful Acts" regarding alleged violation of

10

the Securities Laws, and hence relate back to Office Depot's original notice of circumstances and constitute a "Claim" that is deemed to have been "made" on July 11, 2007.

23.  My conclusion on the matter addressed is mandated by the wording of Clause 7(c) of the applicable AIG Policy, especially when compared to the exclusionary wording that was not included in the NU policy and has just been added to the "successor" policy form rolled out by Chartis last month.  Clause 7(c) of the policy at issue in this case  has a retroactive effect because it expressly provides, without limitation, that a subsequent Claim "…shall be considered made at the time such notice of such circumstances was given." Therefore, for purposes of triggering coverage for "Defense Costs," including the costs of investigation:

A.  The November 2007 derivative and class actions should relate back to the July 11 & 20, 2007 Notice of Circumstances.

B.  The SEC's September 12, 2008 "*subpoenas ad testification and duces tecum*" relate back to the original notice of circumstances, for Insured Person(s)' Defense Cost Coverage.

C.  The January 10, 2008 SEC Order, the various SEC subpoenas, as well as the November 25, 2009, December 1, 2009 and the December 4, 2009 Wells Notices and announced, pending settlement with the SEC all relate back to the original Notice of Circumstances given on July 11, 2007.

D.  The legal fees and expenses incurred directly by Office Depot and indirectly by Office Depot in indemnifying individual, "Insured Persons" for their legal expenses, incurred after the date of the Notice of Circumstances (the date on which the Claim is deemed to have been "made") would constitute "Defense Costs" incurred in connection with a "Securities Claim" and should be reimbursed under the AIG Policy.

11

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: 06/08/10

Perry S. Granof

US2008 13402313.3

# Exhibit A

Office Depot v. National  Union, et al:  Summary of Key Events Underlying Perry S. Granof
Opinions Regarding the Notice of Circumstances Clause

July 11, 2007:
Office Depot, Inc. ("ODI") through its broker ARC Excess and Surplus LLC, (ARC) forwarded
a notice of "potential claim" (ie. circumstances) to NU and other carriers on risk, and included a
copy of the Dow Jones Newswire article. The notice of possible claim is described as pertaining
to: "…weak economic conditions hurting ODI's sales and the timing, in which some Wall Street
analysts received same".

July 17, 2007:
The SEC Miami Regional Office issued a letter advising ODI that it is conducting an inquiry to
determine whether there have been "**any violations of the federal securities laws**."

July 20, 2007:
ODI, through ARC sent an e-mail to NU enclosing a copy of the SEC's July 17, 2007 letter of
inquiry to ODI.

July 31, 2007:
The SEC Miami Regional Office issued a letter requesting that ODI preserve documents of 28
custodians, in addition to 7 custodians identified in ODI's 7/20/07 correspondence to the staff.
The staff represented that it did not believe that the seven custodians identified in ODI's
correspondence were sufficient enough to comply with the staff's July 17 requests."

Late July- November, 2007:
ODI's legal department received a "whistleblower" letter, dated July 3, 2007, from an unnamed
person advising of alleged irregularities in connection with accounting issues, which I
understand led to an internal investigation of the allegations by ODI and by the Audit Committee
of the Board of Directors, culminating in the restatement of earnings announcement referenced
below.

August 6, 2007:
The SEC Miami Regional Office issued an additional letter advising ODI that it is conducting an
inquiry to determine whether there has been **"any violation of the federal securities laws"** and
requesting production of various documents.  The letter asked Office Depot to produce
documents relating to any whistle-blower complaints alleging irregularities concerning
accounting treatment of in-transit or held checks, or other payments at or near the quarter or year
end, or possible irregularities concerning ODI's accounting practices. The staff also requested a
proposed list of 14 custodians for whom documents would be preserved and produced.

August 22, 2007:
Reed Kleinle on behalf of NU wrote to Robert Cricutto of ARC, acknowledging receipt of the
July 11, 2007 notice and of a July 20, 2007 E-mail from ARC, which attached the SEC inquiry
letter dated July, 17, 2007.  NU agreed to treat both documents as a Notice of Circumstances,

1

which could give rise to a claim. NU did not specify the actual scope of the notice, with the exception of citing the 6/29/07 Dow Jones Newswire article and the 7/17/07 SEC inquiry letter.

November 8, 2007:
ODI announced the results of an independent review by its Audit Committee that was initiated as a result of a whistleblower complaint relating to the accounting for vendor programs during the third and fourth quarters of 2006 and the first two quarters of 2007.

November 2007:
Two shareholder derivative lawsuits and two US securities class actions were filed against ODI and certain directors and officers. They were consolidated into two separate, but related lawsuits. These actions related to ODI's accounting treatment of the vendor programs addressed in the November 8, 2007 ODI announcement and referenced the ongoing SEC investigation.

November 16, 2007 – March 18, 2008:
The Miami office of the SEC issued a series of letters to counsel for the persons affected seeking information along with documents and confirming that **Ray Tharpe**, **James Grady**, **Steve Odland**, **Patricia McKay** and **David Fannin, who were being represented by the counsel who received the letters, confirming that the persons named had** agreed to appear and provide testimony to the SEC about the matters being investigated. The letters included SEC Form 1662 advising of the consequences of appearing for testimony; and in addition, forwarded Background Questionnaires, which the SEC typically asks individuals to complete in advance of their testimony. The SEC also requested the production of documents focusing on ODI's estimate of its quarterly and annual earnings and communications with analysts relating to Reg. FD.

January 8, 2008:
Reed Kleinle of NU forwarded a letter and acknowledged that the securities lawsuits constituted ["Claims" and] "Securities Claims" under the subject policy and that the directors and officers named in the lawsuits were "Insured Persons" under the policy. NU asserted a general reservation of rights.

January 10, 2008:
The SEC, through the Commission in Washington DC, issued a formal **"Order Directing Private Investigation and Designating Officers to Take Testimony"**: "…to determine whether any persons or *entities* have engaged in, or are about to engage in, any of the reported acts or practices…." [should the portion of the Order specifically referencing officers, directors and employees, all "insured persons" be quoted?] Specifically, the Commission has empowered officers to investigate possible violations of 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b) 5 of the Exchange Act and Rules 10b5, 12(b-20, 13a-1, 13a-13, 13a-14, 13b2-1 and 13b2-2(a) as well as Regulation FD. This order was forwarded to the Miami Office for mailing on January 18, 2008. **Although no specific persons or entities are identified in this Order, it is issued under the caption: "In the Matter of Office Depot, Inc."** [possible insert here re above quote]

January 18, 2008:

2

ARC forwarded an E-mail to NU advising that ARC was informed that the matter captioned: "Office Depot, Inc. – D&O – Claim Matter: Dow Jones Newswire – Updates", has: "now become a Formal Investigation/Inquiry" and that they believe that a "Claim" has been triggered under the November 30, 2006 to December 31, 2007 policy.

February 14th & 29th, 2008:
Mr. Kleinle of NU forwarded E-mails denying coverage for ODI's "Defense Costs" incurred in connection with the SEC investigation, with respect to both Office Depot and the Insured Persons. According to Kleinle the Definition of "Securities Claim" does not include an SEC investigation of the Organization, and no specific individuals were identified in the SEC "Order". Note: Kleinle added that: **"If (an) insured person is subpoenaed, the subpoena may constitute a claim** (emphasis added)".

April 10, 2008 June 16, 2008:
Stephen Calkins of Office Depot wrote to Reed Kleinle of NU requesting NU to advise of its position regarding coverage for the ongoing costs of responding to the SEC investigation, asserting in part that the undefined term, "Administrative and regulatory proceedings" is broad enough to include SEC investigations, consistent with the reasonable expectations of ODI. The June 16, 2008 letter, noting that a "confidentiality agreement" had been signed, forwarded copies of SEC correspondence, including the letters of July 31, 2007 and August 6, 2007 expanding the scope of the SEC's investigation.

August 11, 2008:
Reed Kleinle on behalf of NU responded to Stephen Calkins' letter of June 16, 2008, which supplemented his letter of August 22, 2007. He commented that an SEC investigation does not constitute a Securities Claims against Office Depot and that an investigation of an "Organization" is expressly excluded from the definition of Securities Claims. He added: "…**there may be coverage available for costs incurred by or on behalf of Insured Persons in responding to an SEC subpoena or inquiry**." (emphasis added).

September 12, 2008 – October 24, 2008:
The Miami Regional Office wrote a series of letters to ODI employees advising them that it is conducting a private non-public investigation. The correspondence enclosed *subpoenas ad testificandum* and *duces tecum*, which were issued pursuant to a **Formal Order of Private Investigation**, entered by the Commission. The subpoenas require the appearance of:

      a.  **Stacey Dockery** on Friday, October 3, 2008,
      b.  **Peter Boyland** on Tuesday, October 7, 2008,
      c.  **Kim Moehler** on Thursday, October 16, 2008,
      d.  **Jennifer Moline** on Tuesday, October 28, 2008,
      e.  **Chuck Rubin** on Friday, October 31, 2008,
      f.  **Scott Stanton** on Thursday, November 13, 2008.

January 22, 2009 and February 11, 2009:
The SEC issued subpoenas, via defense counsel, to Steve Odland and Patricia McKay, both of whom had been named individually as defendants in the consolidated Securities Lawsuits. The

US2008 1340050 1

*subpoena ad testificandum* and *duces tecum*, required Steve Odland to appear for testimony on February 4, 2009; and the *subpoena duces tecum* required Patricia McKay to produce certain documents.

November 25, 2009 and December 1, 2009:
The Miami Office of the SEC sent letters, known as "Wells Notices," to counsel for the individuals involved advising that the staff of the SEC intended to recommend that the Commission bring civil injunction actions against Ray Tharpe and Patricia McKay and Steve Odland, alleging that they had aided and abetted Office Depot's alleged violation of Section 13(a) of the Securities Exchange Act and Regulation FD. The letters also offered the individuals an opportunity to make a **"Wells Submission".**

December 4, 2009:
ODI issued a Form 8-K and announced that it reached a proposed settlement with the SEC to resolve an: "…SEC inquiry that commenced in July 2007 and a **Formal Order of Private Investigation** disclosed in January 2008, with respect to contacts and communications with financial analysts, inventory receipts and reserves, timing of vendor payments, certain inter-company loans, certain payments to foreign officials, inventory obsolescence and timing and recognition of vendor program funds." The Form 8-K also advised that the Company's CEO and two former employees had each received Wells Notices from the SEC.

January 22, 2010:
Letter from David Kuffler of D'Amato and Lynch, on behalf of its client "Chartis Claims, Inc (NU), acknowledging receipt of (1) the Form 8-K dated December 4, 2009 and (2) the Wells notice received by Steve A. Odland dated December 1, 2009. Kuffler acknowledged that "Potential coverage for the Wells Notice would be provided to Office Depot under Coverage B(ii) to the extent that it indemnifies or is permitted or required to indemnify its Directors or Officers for the reasonable and necessary costs of defense, judgment and settlement of Claims covered by the Policy."

4

# Exhibit B



**CHUBB**

**Executive Protection Portfolio** [SM]
*Executive Liability and Entity Securities*
*Liability Coverage Section*

incurred by the **Organization** (including its Board of Directors or any committee of its Board of Directors) in investigating or evaluating on behalf of the **Organization** whether it is in the best interest of the **Organization** to prosecute the claims alleged in a **Securityholder Derivative Demand**.

**Loss** means:

    (a)    the amount that any **Insured Person** (for purposes of Insuring Clauses 1 and 2) or the **Organization** (for purposes of Insuring Clause 3) becomes legally obligated to pay on account of any covered **Claim**, including but not limited to damages (including punitive or exemplary damages, if and to the extent that such punitive or exemplary damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages provided such jurisdiction has a substantial relationship to the relevant **Insureds**, to the Company, or to the **Claim** giving rise to the damages), judgments, settlements, pre-judgment and post-judgment interest and **Defense Costs**; or

    (b)    for purposes of Insuring Clause 4, covered **Investigative Costs**.

**Loss** does not include:

    (a)    any amount not indemnified by the **Organization** for which an **Insured Person** is absolved from payment by reason of any covenant, agreement or court order;



    (b)    any costs incurred by the **Organization** to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

    (c)    any amount incurred by an **Insured** in the defense or investigation of any action, proceeding or demand that is not then a **Claim** even if (i) such amount also benefits the defense of a covered **Claim**, or (ii) such action, proceeding or demand subsequently gives rise to a **Claim**;

    (d)    taxes, fines or penalties, or the multiple portion of any multiplied damage award, except as provided above with respect to punitive or exemplary damages;

    (e)    any amount not insurable under the law pursuant to which this coverage section is construed, except as provided above with respect to punitive or exemplary damages;

    (f)    any amount allocated to non-covered loss pursuant to Subsection 17 of this coverage section; or

    (g)    any amount that represents or is substantially equivalent to an increase in the consideration paid (or proposed to be paid) by an **Organization** in connection with its purchase of any securities or assets.

**Manager** means any natural person who was, now is or shall become a manager, member of the Board of Managers or equivalent executive of an **Organization** that is a limited liability company.



**Executive Protection Portfolio** <sup>SM</sup>
*Executive Liability and Entity Securities*
*Liability Coverage Section*

Item 3(B) of the Declarations for this coverage section, and the Company's liability shall apply only to the remaining percentage of such **Loss**.

(g)    All **Related Claims** shall be treated as a single **Claim** first made on the date the earliest of such **Related Claims** was first made, or on the date the earliest of such **Related Claims** is treated as having been made in accordance with Subsection 15(b) below, regardless of whether such date is before or during the **Policy Period**.

(h)    The limit of liability available during the Extended Reporting Period (if exercised) shall be part of, and not in addition to, the Company's maximum aggregate limit of liability for all **Loss** on account of all **Claims** first made during the immediately preceding **Policy Period**.

*Presumptive Indemnification*

14.    I f the **Organization** fails or refuses, other than for reason of **Financial Impairment**, to indemnify an **Insured Person** for **Loss**, or to advance **Defense Costs** on behalf of an **Insured Person**, to the fullest extent permitted by statutory or common law, then, notwithstanding any other conditions, provisions or terms of this coverage section to the contrary, any payment by the Company of such **Defense Costs** or other **Loss** shall be subject to:

(i)    the applicable Insuring Clause 2 Retention set forth in Item 4 of the Declarations for this coverage section; and

(ii)   the applicable Coinsurance Percentage set forth in Item 3 of the Declarations for this coverage section.

*Reporting and Notice*

15.    (a)    The **Insureds** shall, as a condition precedent to exercising any right to coverage under this coverage section, give to the Company written notice of any **Claim** as soon as practicable, but in no event later than the earliest of the following dates:

(i)    sixty (60) days after the date on which any **Organization's** chief financial officer, in-house general counsel, risk manager, president, chief executive officer or chairperson first becomes aware that the **Claim** has been made;

(ii)   if this coverage section expires (or is otherwise terminated) without being renewed and if no Extended Reporting Period is purchased, sixty (60) days after the effective date of such expiration or termination; or

(iii)  the expiration date of the Extended Reporting Period, if purchased;

provided that if the Company sends written notice to the **Parent Organization**, at any time before the date set forth in (i) above with respect to any **Claim**, stating that this coverage section is being terminated for nonpayment of premium, the **Insureds** shall give to the Company written notice of such **Claim** prior to the effective date of such termination.



**Executive Protection Portfolio** <sup>SM</sup>

*Executive Liability and Entity Securities
Liability Coverage Section*

(b)   If during the **Policy Period** an **Insured:**

    (i)   becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the Company;

    (ii)   receives a written request to toll or waive a statute of limitations applicable to **Wrongful Acts** committed, attempted, or allegedly committed or attempted before or during the **Policy Period** and gives written notice of such request and of such alleged **Wrongful Acts** to the Company; or

    (iii)   gives written notice to the Company of a **Securityholder Derivative Demand,**

then any **Claim** subsequently arising from the circumstances referred to in (i) above, from the **Wrongful Acts** referred to in (ii) above, or from the **Securityholder Derivative Demand** referred to in (iii) above, shall be deemed to have been first made during the **Policy Period** in which the written notice described in (i), (ii) or (iii) above was first given by an **Insured** to the Company, provided any such subsequent **Claim** is reported to the Company as set forth in Subsection 15(a) above. With respect to any such subsequent **Claim,** no coverage under this coverage section shall apply to loss incurred prior to the date such subsequent **Claim** is actually made.

(c)   The **Insureds** shall, as a condition precedent to exercising any right to coverage under this coverage section, give to the Company such information, assistance, and cooperation as the Company may reasonably require, and shall include in any notice under Subsection 15(a) or (b) a description of the **Claim,** circumstances, or **Securityholder Derivative Demand,** the nature of any alleged **Wrongful Acts,** the nature of the alleged or potential damage, the names of all actual or potential claimants, the names of all actual or potential defendants, and the manner in which such **Insured** first became aware of the **Claim,** circumstances, or **Securityholder Derivative Demand.**

---

### Defense and Settlement

16.  (a)   It shall be the duty of the **Insureds** and not the duty of the Company to defend **Claims** made against the **Insureds.**

    (b)   The **Insureds** agree not to settle or offer to settle any **Claim,** incur any **Defense Costs** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Company's prior written consent. The Company shall not be liable for any element of **Loss** incurred, for any obligation assumed, or for any admission made, by any **Insured** without the Company's prior written consent. Provided the **Insureds** comply with Subsections 16(c) and (d) below, the Company shall not unreasonably withhold any such consent.

    (c)   With respect to any **Claim** that appears reasonably likely to be covered in whole or in part under this coverage section, the Company shall have the right and shall be given the opportunity to effectively associate with the **Insureds,** and shall be consulted in advance by the **Insureds,** regarding the investigation, defense and settlement of such **Claim,** including but not limited to selecting appropriate defense counsel and negotiating any settlement.

# Exhibit C

LIABILITY OF CORPORATE OFFICERS AND DIRECTORS   App. D–16

The INSUREDS and the COMPANY shall cooperate with the INSURER and give such additional information as the INSURER may reasonably require.

The INSUREDS and/or the COMPANY shall give written notice to the INSURER within 30 days after the in-house general counsel or risk manager of the COMPANY first receives or has notice of any:

      (i)     material change in the terms or conditions of the UNDERLYING INSURANCE; or

      (ii)    nonrenewal or cancellation of the UNDERLYING INSURANCE,

occurring during the POLICY PERIOD or the Discovery Period (if elected pursuant to Clause 22 below) and any additional premium reasonably required by the INSURER as a result of such change, nonrenewal or cancellation shall be paid within thirty days of the request therefor by the INSURER.

14.    **LOSS PROVISIONS**

    (a)    The time when a CLAIM shall be made for purposes of determining the application of Clause 1 (Insuring Clause) above shall be the date on which the CLAIM is first made against the INSURED.

    (b)    If during the POLICY PERIOD or the Discovery Period (if elected pursuant to Clause 22 below), the INSUREDS or the COMPANY shall become aware of any circumstances that are likely to give rise to a CLAIM being made against the INSUREDS and shall give written notice to the INSURER of the circumstances and the reasons for anticipating a CLAIM, with particulars as to dates and persons involved, then any CLAIM that is subsequently made against the INSUREDS arising out of such circumstances shall be treated as a CLAIM made during the first POLICY YEAR in which the INSUREDS or the COMPANY gave such notice.

    (c)    The COMPANY and the INSUREDS shall give the INSURER such information and cooperation as it may reasonably require and as shall be in the COMPANY'S and the INSUREDS' power.

15.    **OTHER INSURANCE**

    Subject to subparts (e) and (f) of Clause 3 (Exclusions), if other valid and collectible insurance with any other insurer, whether such insurance is issued before, concurrent with, or after inception of this POLICY, is available to the INSUREDS covering a CLAIM also covered by this POLICY, other than the UNDERLYING INSURANCE and insurance that is issued specifically as insurance in excess of the insurance afforded by this POLICY, this POLICY shall be in excess of and shall not contribute with such other insurance. Without limiting the foregoing, this POLICY is specifically excess of and shall not contribute with any insurance which is maintained by a NON-PROFIT OUTSIDE ENTITY and available to an INSURED. Except as allowed by subpart (c) of Clause 1 (Insuring Clause), nothing herein shall be construed to make this POLICY subject to the terms of other insurance.

CGDA PREMIER
:04 ED 03/04

12

(Rel.10–11/04  Pub.63962)

# Exhibit D

not be considered a nonrenewal for purposes of triggering the rights to the **Extended Reporting Period**.

B. The **Insurer** shall give the **Named Insured** notice of the premium due for the **Extended Reporting Period** as soon as practicable following the date the **Named Insured** gives such notice of such election and such premium shall be paid by the **Named Insured** to the **Insurer** within 10 days following the date of such notice by the **Insurer** of the premium due. The **Extended Reporting Period** is not cancelable and the entire premium for the **Extended Reporting Period** shall be deemed fully earned and non-refundable upon payment.

C. The Limit of Liability applicable to the **Extended Reporting Period**, if elected, shall be part of and not in addition to the Limit of Liability shown in Item 3 of the Declarations for the immediately preceding **Policy Period**. The purchase of the **Extended Reporting Period** shall not increase or reinstate the Limit of Liability, which shall be the maximum liability of the **Insurer** for the **Policy Period** and **Extended Reporting Period**, combined.

VII. LIMIT OF LIABILITY

A. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**. All **Loss** resulting from a single **Claim** shall be deemed a single **Loss**.

B. The Aggregate Limit stated in Item 3 of the Declarations shall be the maximum aggregate liability of the **Insurer** for all **Loss** resulting from all **Claims** first made during the **Policy Period**.

C. **Defense Costs** shall be part of and not in addition to the Limit of Liability shown in Item 3 of the Declarations, and **Defense Costs** shall reduce such Limit of Liability. If the Limit of Liability is exhausted by payment of **Loss**, the obligations of the **Insurer** under this **Policy** shall be completely fulfilled and extinguished. Subject to the terms of Section XV, Payment Priority, the **Insurer** is entitled to pay **Loss** as it becomes due and payable by the **Insureds**, without consideration of other future payment obligations.

VIII. RETENTIONS

A. Except as otherwise provided in this section, the liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the applicable Retention amount shown in Item 4 of the Declarations. Such Retention shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

B. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

C. No Retention shall apply to any **Loss** incurred by any **Insured Person** except when and to the extent that the **Company** has indemnified the **Insured Person**.

IX. NOTICE

A. The **Insureds** shall, as a condition precedent to their rights under this **Policy**, give to the **Insurer** written notice of any **Claim** made against the **Insureds** as soon as practicable, but in no event later than the termination of the **Policy Period** or, if elected, the **Extended Reporting Period**.

B. If, during the **Policy Period**, the **Insureds** first become aware of facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds** give written notice to the **Insurer** during the **Policy Period** of:

1. the identity of the potential claimants;

2. a description of the anticipated **Wrongful Act** allegations;

3. the identity of the **Insureds** allegedly involved;

4.  the circumstances by which the **Insureds** first became aware of the facts or circumstances;

5.  the consequences which have resulted or may result; and

6.  the nature of the potential monetary damages and non-monetary relief;

then any **Claim** which arises out of such **Wrongful Act** shall be deemed to have been first made at the time such written notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

C.  All notices under any provision of this **Policy** shall be in writing and given by prepaid express courier, certified mail or facsimile transmission properly addressed to the appropriate party. Notice to the **Insureds** may be given to the **Named Insured** at the address shown in Item 1 of the Declarations. Notice to the **Insurer** of any **Claim** or **Wrongful Act** shall be given to the **Insurer** at the address shown in Item 5A of the Declarations. All other notices to the **Insurer** under this **Policy** shall be given to the **Insurer** at the address shown in Item 5B of the Declarations. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

D.  No notice that may be given during the **Policy Period** under Section IX, Notice, at subsection B may be given during the **Extended Reporting Period**, if elected.

X.  DEFENSE AND SETTLEMENT

A.  It shall be the duty of the **Insureds** and not the duty of the **Insurer** to defend any **Claim**.

B.  The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**. The **Insurer** shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s). However, if the **Insureds** are able to settle all **Claims** which are subject to a single Retention for an aggregate amount, including **Defense Costs**, not exceeding such Retention, the consent of the **Insurer** shall not be required for the settlement of such **Claims**.

C.  The **Insurer** shall have the right and shall be given the opportunity to effectively associate with the **Insureds** regarding the defense and negotiation of any settlement of any **Claim**.

D.  The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery. The **Insurer** may make any investigation it deems necessary.

E.  Subject to Section XII, Allocation, the **Insurer** shall, on a quarterly basis, advance on behalf of the **Insureds** covered **Defense Costs** which the **Insureds** have incurred in connection with **Claims** made against them, prior to disposition of such **Claims**. Any advancement of **Defense Costs** shall be subject to the condition that such advanced amounts shall be repaid to the **Insurer** by the **Insureds** severally according to their respective interests if and to the extent the **Insureds** shall not be entitled to coverage for such **Defense Costs** under the terms and conditions of this **Policy**.

XI.  PRESUMPTIVE INDEMNIFICATION

The **Company** agrees to indemnify the **Insured Persons** to the fullest extent permitted by law, taking all steps necessary or advisable in furtherance thereof, including the making in good faith of any application for court approval, the passing of any resolution by the board of directors or shareholders of the **Company**, the amendment of any charter, bylaws, operating agreement or similar documents of the **Company** or the execution of any contract. The **Company** further agrees to advance **Defense Costs** actually and reasonably incurred by any **Insured Person** in defending any threatened, pending or contemplated action, suit or proceeding prior to a final disposition of any such action, suit or proceeding and shall not require any determination or adjudication, interim or final, of the entitlement of the **Insured Person** to indemnification, where permitted by law to do so. The financial ability of any **Insured Person** to make repayment shall not be a prerequisite to the making of such an advance, and the right

# Exhibit E





NU 001722



## Your world has changed...
## has your D&O insurance kept up?

The personal risk associated with being an officer or director of a publicly-held company has vastly changed over the last decade. From the risk of having to return compensation under Sarbanes-Oxley to the threat of criminal prosecution and incarceration in a foreign jurisdiction, executives face a higher level of personal liability today than ever before. Financial scandals, changes in the law, and the credit crisis have fundamentally changed what it means to be a business leader.

- Shareholder derivative suits, once no more than an afterthought, have taken center stage.
- Investigations once pursued confidentially now trigger well publicized responses from domestic and foreign enforcement authorities.
- Scrutiny of corporate executives' conduct and their compensation has intensified. Reputations have become negotiating leverage and may be irrevocably tarnished in the media well before a claim reaches the courtroom.
- Globalization and e-commerce have made the world a smaller yet more complex place to do business.
- The credit crisis, bankruptcies, bank failures and ponzi schemes have lawmakers around the world seeking reform while the public looks for someone to blame.

*Nearly three quarters of FORTUNE® 500 boards count on Chartis to protect their members' assets.*

## We set the standard...

We set the standard for primary public company D&O coverage. Executive Edge℠ has raised the bar with its innovative, cutting edge features that provide real responses to the concerns of today's executives.

No one is better equipped than Chartis to deliver locally admitted coverage to directors and officers around the globe. Chartis has the largest global network of any property and casualty insurance organization, a network spanning over 160 countries and jurisdictions worldwide.

NU 001723

Executive Edge                                                              CHARTIS

(b) *Relation Back to the First Reported Claim or Pre-Claim Inquiry*

Solely for the purpose of establishing whether any subsequent Related Claim is first made or a Related Pre-Claim Inquiry was first received during the Policy Period or Discovery Period (if applicable), if during any such period:

(1) a Claim was first made and reported in accordance with Clause 7(a) above, then any Related Claim that is subsequently made against an Insured and that is reported in accordance with Clause 7(a) above shall be deemed to have been first made at the time that such previously reported Claim was first made; and

(2) a Pre-Claim Inquiry was actually first received by an Insured Person and reported in accordance with Clause 7(a) above, then:

   (i) any Related Pre-Claim Inquiry that is reported in accordance with Clause 7(a) above shall be deemed to be a Pre-Claim Inquiry first received at the time that such previously reported Pre-Claim Inquiry was first received by an Insured Person; and

   (ii) any subsequent Related Claim that is reported in accordance with Clause 7(a) above shall be deemed to be a Claim first made at the time that such previously reported Pre-Claim Inquiry was first received by an Insured Person.

With respect to any subsequent Related Pre-Claim Inquiry, this policy shall not cover Loss incurred before such subsequent Related Pre-Claim Inquiry is actually received by an Insured Person, and with respect to any subsequent Related Claim, this policy shall not cover Loss incurred before such subsequent Related Claim is actually made against an Insured. Claims actually first made or deemed first made prior to the inception date of this policy, Pre-Claim Inquiries first received or deemed first received by an Insured Person prior to the inception date of this policy, and Claims or Pre-Claim Inquiries arising out of any Circumstances of which notice has been given under any directors and officers liability insurance policy in force prior to the inception date of this policy, are not covered under this policy.

(c) *Relation Back to Reported Circumstances Which May Give Rise to a Claim*

If during the Policy Period or Discovery Period (if applicable) an Organization or an Insured Person becomes aware of and notifies the Insurer in writing of circumstances that may give rise to a Claim being made against an Insured and provides details as required below, then any Claim that is subsequently made against an Insured that arises from such circumstances and that is reported in accordance with Clause 7(a) above shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent Claim was first made during the Policy Period or during the Discovery Period (if applicable). Coverage for Loss arising from any such subsequent Claim shall only apply to Loss incurred after that subsequent Claim is actually made against an Insured. In order to be effective, notification of circumstances must specify the facts, circumstances, nature of the alleged Wrongful Act anticipated and reasons for anticipating such Claim, with full particulars as to dates, persons and entities involved; however, notification that includes a copy of an agreement to toll a statute of limitations shall be presumed sufficiently specific as to the potential Claims described within that agreement

NU 001735