# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-80554-CIV-MARRA

**OFFICE DEPOT, INC.**
      **Plaintiff,**

**vs.**

**NATIONAL UNION FIRE INSURANCE**
**COMPANY OF PITTSBURGH, PA.**
      **Defendant,**

**AMERICAN CASUALTY INSURANCE**
**COMPANY OF READING, PA.,**
      **Intervenor Defendant.**
_____/

## MEMORANDUM OPINION AND ORDER ON
## CROSS MOTIONS FOR SUMMARY JUDGMENT

In this diversity case, Office Depot, Inc. ("Office Depot) sues National Union Fire

Insurance Company of Pittsburgh, Pa. ("National Union") and American Casualty Insurance

Company of Reading, Pa. ("American Casualty") (cumulatively "the carriers")  for declaratory

judgment and breach of contract.  The plaintiff and the defendants have cross-moved for

summary judgment under Fed. R. Civ. P. 56  [DE ## 87, 101, 102].

The competing motions present the question of whether a corporation can recover under

an organization and executive liability insurance policy for  costs incurred in voluntarily

responding to a Securities and Exchange Commission ("SEC") investigation that did not

culminate in filing of a judicial or administrative complaint by the SEC against the company or

any of its officers or directors, or for costs incurred in conducting an internal investigation and

audit triggered by a whistleblower complaint over alleged accounting improprieties.  For reasons

which follow, the court has determined that the disputed investigatory costs do not fall within the

subject policy's  definition of loss "arising from" a covered  "Securities Claim" made against

Office Depot, or a covered "Claim" made against one of its officers, directors or employees, and

shall accordingly enter final summary judgment on coverage in favor of the carriers.

## I. FACTS

National Union issued a "claims made"  Executive and Organization Liability Policy to

Office Depot ("Policy" or "Primary Policy") providing coverage for claims made during the

policy period of  November 30, 2006 to November 30, 2007.[1]  The  Policy provides three types

of coverage: executive liability insurance (Coverage A), organization insurance (Coverage B) and

outside entity executive liability insurance (Coverage C).  The Policy carries an aggregate limit

of liability of  $25 million, subject to a $2.5 million retention (similar to a deductible),  and a

20% coinsurance provision.

American Casualty issued an Excess Insurance Policy to Office Depot ("Excess Policy")

for the same period providing $15 million in coverage that applies in  excess of the $25 million

limits of liability provided under the National Union policy.  The Excess Policy  "follows form,"

i.e. it provides coverage in conformance with the same terms, conditions and exclusions as those

set forth in the National Union Policy.

## A.  The  Policy

At issue here, under the National Union Policy  "Insuring Agreements" [Policy, Section

1], is the "Organization Insurance" extended under  Coverage B.   Coverage B provides two

---

[1]A "claims made" policy limits coverage to claims made during the policy period and
reported to the insurer within a certain period of time.   An "occurrence" policy, in contrast,
covers actions and omissions which occur within the policy period,  regardless of the date of
discovery or the date the claim is made or asserted.  *Gulf Ins. Co.  v Dolan, Fertig and Curtis*, 433
So.2d 512 (Fla. 1981); *Moncello v Federal Ins. Co.*, 558 So.2d 1081 (Fla. 5th DCA 1990).

types of insurance relevant to the current claims.  First, Coverage B(i) insures Office Depot for

certain "Securities Claims" made directly against it for any "Wrongful Act" as an

"Organization," and second, Coverage B(ii) extends executive indemnity insurance, providing

reimbursement to Office Depot to the extent it indemnifies its individual officers, directors and

employees for damages that they would otherwise be obligated to pay for "Claims" made against

them for any "Wrongful Act" performed in their capacity as directors, officers and employees of

the company.

The Policy at Section 1, "Coverage  B" provides:

**COVERAGE B: ORGANIZATION INSURANCE**

(i) *Organization Liability*: This Policy shall pay the Loss of any Organization arising from a Securities Claim made against such Organization for any Wrongful Act of such Organization.

(ii) *Indemnification of an Insured  Person*: This policy shall pay the Loss of an Organization arising from a Claim made against an Insured Person (including an Outside Entity Executive) for any Wrongful Act of such Insured Person, but only to the extent that such Organization has indemnified such Insured Person.

At Section  8, captioned "Defense Costs, Settlements, Judgments," the Policy reiterates

this dichotomy in  B(i) and B(ii) coverages,  providing in pertinent part:

An Organization is covered, subject to the policy's terms, conditions and limitations only with respect to: (1) its indemnification of its Insured Persons under Coverage B(ii) as respects a Claim against such Insured Persons; and (2) under Coverage B(i) for a Securities Claim.  Accordingly, <u>the Insurer has no obligation under this policy for covered Defense Costs incurred by</u>, judgments against or settlements by <u>an Organization arising out of a Claim made against an Organization other than a covered Securities Claim</u>, or any obligation to pay Loss arising out of any legal liability  that an Organization has to a claimant, except as respects a covered Securities Claim against such Organization.

(Emphasis supplied)

A "Wrongful Act" is defined at Section 2(aa)(2) , with respect to Office Depot as the "Organization," as "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Organization, but solely  in regard to a Securities Claim." With respect to any "Executive" or "Employee"[2] of the Organization, a "Wrongful Act"is defined at Section 2(aa)(1) in pertinent part to mean "any actual or alleged breach of duty,  neglect, error, misstatement, misleading statement, omission or act or any actual or alleged Employment Practices Violation,  in regard to *either* a Securities Claim or other Claim."

In turn, the Policy defines a "Securities Claim," at Section 2(y) as follows:

> (y) "Securities  Claim" means a Claim, <u>other than an administrative or regulatory proceeding against</u>, <u>or investigation of</u> <u>an Organization</u>, made against any insured:
>
>> (1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:
>> (a) brought by any person or entity  alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation  of an offer to purchase or sell any securities of an organization; or
>>
>> (b) brought by a security  holder of an organization with respect to such security holder's interest in securities of such Organization; or
>
> (2) brought derivatively on the behalf of an Organization by a security  holder of such Organization.
> <u>Notwithstanding the foregoing, the term "Securities Claim" shall include an administrative or regulatory proceeding against an Organization,  but only if and only during the time  that such proceeding is also commenced and continuously maintained against an Insured Person.</u>

---

[2]With regard to a "Claim"  against an "Employee," the definition of a  "Wrongful Act" further requires that a  Claim be "made and continuously maintained against an Executive of" Office Depot. [Policy, Section 2(aa)(1). ]

4

(Emphasis supplied).

At Section 2(b), the Policy defines a "Claim" to mean:

(1) a written demand for monetary, non-monetary or injunctive relief;

(2) <u>a civil, criminal, administrative, regulatory or arbitration proceeding for</u> monetary, non-monetary or injunctive relief <u>which is commenced by</u>: (i) <u>service of a complaint</u> or similar pleading; (ii) <u>return of an indictment</u>, information or similar document (in the case of a criminal proceeding); or (iii) receipt or filing  of <u>a notice of charges</u>; *or*

(3) <u>a civil, criminal or administrative or regulatory  investigation of an Insured Person</u>:
(i) <u>once such insured Person is identified in writing by such investigating authority  as a person against whom a proceeding described in Definition (b) (2) may be commenced;</u> *or*
(ii) <u>in  the case of an investigation by the SEC</u> or a similar state or foreign government authority,  <u>after service of a subpoena on such Insured Person.</u>

The term "Claim" shall include any Securities Claim and any Employment Practices Claim.

(Emphasis supplied)

Section  2(p) of the Policy defines "Loss" to include "Defense Costs" (in addition to "damages, settlement, judgments"). "Defense Costs," in turn, are defined in pertinent part at Section 2(f) as "reasonable and necessary fees, costs and expenses consented to by the Insurer ... resulting solely from the investigation, adjustment, defense and /or appeal of a Claim against an Insured."

Section  2(n) defines "Insured" to mean any "Insured Person," or "the Organization, but only with respect to a Securities Claim."

Section 2(t) defines "Organization" to mean  Office Depot and its subsidiaries. Section 2(o) defines "Insured Person" to include  any "Executive" or  "Employee" of  Office Depot or its subsidiaries.

### B. Chronology of Material Events

### 1. The Dow Jones Newswire Article

On June 29, 2007, a  "Dow Jones Newswire" article reported that Office Depot may have improperly disclosed material information regarding projected profits and sales to certain financial analysts, potentially implicating SEC Regulation FD (Fair Disclosure) which precludes issuers of securities from selectively disclosing material nonpublic information.   On July 11, 2007, Office Depot forwarded a copy of this article, denominated as a  "Notice of Circumstances," by email to National Union and American Casualty.

### 2.  The SEC Informal Inquiry

On July 17, 2007, the SEC issued a letter to Office Depot advising that it was "conducting an inquiry into Office Depot, Inc....to determine whether there have been any violations of the federal securities laws." The inquiry letter requested "certain information from Office Depot on a voluntary basis," including various documents relating to Office Depot's contacts and communications with financial analysts during 2007.    It concluded with a caveat that the inquiry "should not be construed as an indication by the Commission or its staff that any violation of law has occurred, or as a reflection upon any person, entity or security."

On July 20, 2007, Office Depot  forwarded a copy of this letter to its insurers by email, denominating the item as "Supplementary to the Notice of Circumstances" previously sent on July 11, 2007.

On July 31, 2007, the SEC sent a letter to Office Depot directing it to preserve the records of numerous Office Depot employees and officers which it identified by job title.

On August 22, 2007, Reed Kleinle, a National Union claims adjuster, wrote Office Depot a letter in which he accepted the Dow Jones Newswire and the SEC inquiry letter as a "Notice of Circumstances which may reasonably be expected to give rise to a Claim."

In response to the SEC's letter of inquiry, Office Depot opted to voluntarily cooperate with the SEC by providing documents and making its employees and officers available for sworn testimony without the issuance of subpoenas.

### 3. The Office Depot Audit Committee Review and Financial Restatement

In July 2007, before it received the SEC informal inquiry, Office Depot received an internal "whistleblower" letter that alleged various accounting irregularities principally relating to the timing of Office Depot's recognition of certain vendor rebate program funds,  triggering an internal review and investigation by the Office Depot Audit Committee.  The Committee retained lawyers, accountants and consultants to assist in its review.

On October 29, 2007, Office Depot announced that it was delaying release of  its 2007 3d Quarter earning statement due to the pendency of this investigation.  Ultimately, as a result of the Audit Committee investigation, the Board of Directors approved a restatement of Office Depot's financial statements for 2006, including changes to amounts reported in the 1st and 2nd Quarters of 2007.

Office Depot self-reported the issues which were the subject of the restatement to the SEC, and in November 2007, the SEC expanded its inquiry to examine the timing of recognition of vendor rebate programs funds.

### 4.  The Securities Litigation

In early November, 2007,  two shareholder derivative lawsuits and  two securities lawsuits were filed against Office Depot and a number of its officers and directors in the United States District Court for the Southern District of Florida.  The securities actions, consolidated as *Sheet Metal Workers Local 28 Pension Fund v Office Depot et. al,* Case No. 07-81038-CIV-HURLEY, alleged that Office Depot and its officers made material misrepresentations regarding Office Depot's reporting of vendor rebates.  Upon Office Depot's motion, on January 14, 2010, the district court dismissed the complaints in the securities  actions with prejudice for failure to adequately plead scienter in accordance with the Private Securities Litigation Reform Act (PSLRA).  This ruling is currently on appeal before the Eleventh Circuit Court of Appeals.

The shareholder derivative actions, consolidated as *Mason et al. v Odland et al.,* Case No. 07-81059-CIV-HURLEY, alleged that various officers and directors of Office Depot breached fiduciary duties to Office Depot by causing the company to misrepresent  its financial results in connection with the vendor rebate program.  Pursuant to plaintiffs' voluntary notice of dismissal, on April 30, 2010, the district court dismissed the derivative actions without prejudice.

Both sets of lawsuits were dismissed before any discovery proceedings.

### 5. The SEC Formal Investigation and Wells Notices

On January 10, 2008, the SEC issued a formal "order directing private investigation" and over the summer and fall of  2008  issued a series of related  subpoenas to Office Depot and at least eight of its current or former employees or officers, including several persons who previously voluntarily  testified in response to the SEC's informal requests for information.

This notice did not name any specific director or officer of Office Depot as a wrongdoer, but did contain allegations of wrongful conduct generally attributable to Office Depot's officers and directors.

On November 25, 2009 and December 1, 2009, the SEC also issued so-called  "Wells Notices" to three Office Depot officers, indicating that the SEC enforcement division intended to recommend to the Commission that enforcement proceedings be instituted against them.

The SEC letters,  subpoenas and Wells notices were accompanied by Form 1662, which provides "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena."  Form 1662 states, "If your testimony is not pursuant to a subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish.  Your cooperation is, however, appreciated."   Like the letters and formal order of investigation, Form 1662 does not identify any specific director, officer or employee as a person against whom a civil, criminal, administrative or regulatory proceeding may be commenced.

### 6.  The Proposed Settlement

In December,  2009, Office Depot announced that it had reached a proposed settlement with the staff of the SEC.  The record does not reveal any further details regarding the status of the proposed settlement.

### 7.  The Insurance Claim

Prior to commencement of this action, Office Depot requested reimbursement from National Union of over  $23 million in  legal fees and expenses that Office Depot has incurred in responding to and settling with the SEC,  indemnifying Insured Persons against defense costs,

and conducting the internal investigation and audit triggered by its whistleblower complaint.

While National Union acknowledged its obligation to indemnify Office Depot for the defense costs incurred by officers and directors served with SEC subpoenas and Wells Notices, and for the costs incurred in defending the various securities lawsuits, [3] it has denied Office Depot's claim for reimbursement of earlier SEC response costs and the cost of its internal investigation and audit.

By its current complaint, Office Depot seeks a declaration of coverage for such investigatory costs incurred since July, 2007 under the Primary Policy issued by National Union (Count 1) and the Excess Policy issued by American Casualty (Count 3). It also asserts a breach of contract claim against National Union seeking monetary damages for these losses (Count 2).

### 8. Procedural Posture

The case is now before the court upon the parties' cross motions for summary judgment. Plaintiff Office Depot seeks a partial summary judgment declaring the existence of coverage for the disputed investigatory costs, with the amount of such costs to be determined at trial.   The carriers seek summary judgment establishing that there is no coverage under the policy for defense costs incurred by Office Depot in voluntarily responding to the SEC's investigation, or for costs incurred by Office Depot in the course of its own internal investigation and audit because (1) in the case of the former, these are not "defense costs" which arise from a covered "Securities Claim" against Office Depot or a "Claim" against an Office Depot officer, director or employee, and (2) in the case of the latter, these are not "defense costs" which "result solely

---

[3]As to these limited categories, National Union has recognized "Defense Costs" in the total amount of $1,125,102.72 as of January 22, 2010. Because this amount is less than the $2.5 million policy retention, National Union has not made any payment to Office Depot on its claim.

from" a "Securities Claim" against Office Depot as the "Organization" or a "Claim" against one

of its officers, directors or employees, as  these  terms are defined in the Policy .

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with  the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving  party is entitled  to a judgment as a

matter of law." *Anderson v Liberty Lobby, Inc*., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L.Ed.2d

202 (1986), citing Fed. R. Civ. P. 56(c).   A fact  is "material" if it is a legal element  of the claim

under applicable  substantive law that may affect the resolution of the action.  *Id.* at 248.   An

issue is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the

non-moving party. *Id.*

The moving party bears the initial burden of showing the court, by reference to the record,

that there are no genuine issues of material fact to be decided at trial. *Celotex Corp.  v Catrett*,

477 U.S. 317, 323, 106 S. Ct. 2548, 9 L.Ed.2d 265 (1986).  Once that initial burden is met, the

party opposing summary judgment must go beyond the pleadings and "come forward with

'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v

Zenith Radio Corp*.,  475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

In ruling on a motion for summary judgment, the court must  view the evidence and all

factual inferences arising therefrom in the light most favorable to the non-moving party. *Witter v

Delta Air Lines, Inc.,* 138 F.3d 1366, 1369 (11th Cir. 1998*);  Clemons v Dougherty County Ga.*,

684 F.2d 1365, 1368 (11th Cir. 1982).  The court must then decide whether "the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Allen v Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997), quoting *Anderson*, 477 U.S. at 251-52, 106 S. Ct. 2505.

Where the underlying facts giving rise to the claim are not in dispute, insurance coverage questions are generally well suited for disposition by summary judgment. *National Union Fire Ins. Co. of Pittsburgh, Pa. v Underwriters at Lloyds, London,* 971 So.2d 885 (Fla. 3d DCA 2007).

### III. DISCUSSION

### A. Conflict-of-Law Issue

A federal court sitting in diversity must apply both the substantive law of the forum, as well as the conflict of law rules of the forum state. *LaFarge Corp. v. Travelers Indemnity Co.,* 118 F.3d 1511, 1515 (11th Cir. 1997).   Under Florida's conflict-of-law rules, "[t]he doctrine of *lex loci contractus* directs that, in the absence of a contractual provision specifying governing law, a contract [other than one for performance of services] is governed by law of the state in which the contract is made...." *Shaps v Provident Life & Acc. Ins. Co.*, 317 F.3d 1326, 1329-30 (11th Cir. 2003), citing *Firoetti v Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995).

The insurance contract in this case was executed in New York and delivered to Office Depot at its headquarters in Florida.  The parties do not agree on whether Florida or New York law governs interpretation of the contract under a Florida conflict-of- law analysis, but  they do agree that there is no conflict between the laws of  Florida and New York on the rules governing insurance policy construction, and agree to application of Florida law.

12

The court agrees that the general precepts of insurance policy construction are substantially the same in both states. While it would therefore be appropriate for the court to avoid the "false conflicts" question and simply decide the insurance coverage questions raised under the law of each of the interested states, *Cooper v Meridian Yachts, Ltd.*, 575 F.3d 1151 (11th Cir. 2009), because there is clearly no difference in the substantive law of the competing states, the court will simply apply the law of the forum as the more expedient method of deciding the conflicts issue. *Firoetti v Massachusetts General Life Ins. Co.*, 53 F.3d 1228, 1234 n. 21 (11th Cir. 1995), *cert. den*. 516 U.S. 1046 (1996)(when "plainly clear" that law of competing states is the same, courts may look to law of forum state to decide the issue, a method which "enjoys the additional virtues of being more streamlined and less time-consuming, since only one body of law need be employed to resolve the dispute").

## B. General Precepts of Insurance Policy Construction

Under Florida law, the interpretation of an  insurance policy is a question of law for the court. *Technical Coating Applicators, Inc. v U.S. Fidelity & Guaranty Co.*, 157 F.3d 843 (11th Cir. 1998); *Arnold v Life Ins. Co. of North America*, 894 F.2d 1566 (11th Cir. 1990)*; Penzer v Transportation Ins. Co.*, 29 So.3d 1000( Fla. 2010).  As a basic premise in this exercise, clear and unambiguous policy terms should be  given their plain, ordinary and generally accepted meaning. *Taurus Holdings, Inc. v U.S. Fid. & Guar. Co.*, 913 So.2d 528 (Fla. 2005); *Union American Ins. Co. v Maynard*, 752 So.2d 1266 (Fla. 4th DCA 2000). However, in applying the "plain meaning" rule,  courts must not construe insurance policy provisions in isolation, but instead should read all  terms  in light of the policy as a whole, with every provision given its full meaning and operative  effect. *Auto Owners Ins. Co v Anderson*, 756 So.2d 29 (Fla. 2000); *First

*Professionals Ins. Co. v McKinney,* 973 So.2d 510 (Fla. 1st DCA 2007).

If insurance policy provisions are ambiguous and cannot be reasonably reconciled, then well established rules of construction must be applied. *Discovery Property & Cas. Ins. Co. v Beach Cars of West Palm, Inc.,* 929 So.2d 729, 732 (Fla. 4th DCA 2006). One such basic tenet is that ambiguous policy provisions are to be liberally construed in favor of the insured and against the insurer, as drafter of the contract, under the rule of *contra proferentem. Dickson v Economy Premier Assur. Co.,* 36 So. 3d 789 (Fla. 5th DCA 2010). Policy language is considered ambiguous within the ambit of this rule if it is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage. *Garcia v Federal Ins. Co.,* 969 So.2d 288 (Fla. 2007); *Flores v Allstate Ins. Co.,* 819 So.2d 740 (Fla. 2002).

However, "the rule of adverse construction" is a "secondary rule of interpretation" or a "rule of last resort," which should not be used if the parties' intent can otherwise be determined from a plain reading of the policy. *Emerald Pointe Property Owners' Ass'n, Inc. v Commercial Construction Ind.* 978 So.2d 873, 878 n. 1 (Fla. 4th DCA 2008). If a policy provision is clear and unambiguous, the court cannot indulge in construction or interpretation of its plain meaning, and should simply enforce it according to its terms, whether it is a basic insuring clause or an exclusionary provision. *Garcia* at 291; *BMW of North America, Inc. v Krathen,* 471 So.2d 585 (Fla. 4th DCA 1985), *rev den.* 484 So.2d 7 (Fla. 1986).

The initial determination of whether a policy term is ambiguous is a question of law for the court. *Escobar v United Auto Ins. Co.,* 898 So.2d 952 (Fla. 3d DCA 2005). If the facts are not in dispute and the ambiguity is "patent," i.e. it appears on the face of the contract, the court may resolve the ambiguity as a matter of law by liberally interpreting the language in favor of

14

coverage. *Da Costa v General Guaranty Ins. Co. of Florida,* 226 So.2d 104, 105 (Fla. 1969). On the other hand, where contract language is rendered ambiguous by some collateral matter, it is said to have a "latent" ambiguity, and extrinsic evidence may be used to determine the intent of the parties and resolve the ambiguity. *Mac-Gray Services, Inc. v Savannah Associates of Sarasota, LLC,* 915 So.2d 657 (Fla. DCA 2005).

To find in favor of the insured under the rule of *contra proferentem*, the policy must actually *be* ambiguous, that is, a genuine inconsistency, uncertainty or ambiguity in meaning remains after resort to ordinary rules of construction. *Taurus Holdings* at 532; *Deni Associates of Florida, Inc. v State Farm Fire & Casualty Ins. Co.,* 711 So.2d 1135 (Fla. 1998). The lack of a definition of an operative term does not, by itself, create an ambiguity, *State Farm & Cas. Co v CTC Development Corp.,* 720 So.2d 1072 (Fla. 1998); *Kepler v Georgia Intern. Life Ins. Co.,* 538 So.2d 940 (Fla. 2d DCA 1989), nor is a provision considered ambiguous simply because it is complex and requires analysis to interpret it. *Garcia* at 291; *Swire Pacific Holdings Inc. v Zurich Ins. Co.,* 845 So.2d 161 (Fla. 2003); *Koenigsberg v Intercontinental Ins. Co.,* 571 So.2d 578 (Fla. 4th DCA 1990). Moreover, the fact that different judges may have reached different interpretations of similar policy language does not necessarily mean that the language is ambiguous. *Eastpointe Condominium I Ass'n, Inc. v Travelers Cas. & Surety Co. of America,* 2010 WL 1995841 (11th Cir. (Fla.) May 20, 2010) (unpub.), *citing Deni Associates of Florida Inc. v. State Farm Fire & Cas. Ins. Co.,* 711 So.2d 1135 (Fla. 1998).

If the relevant policy language is clear and unambiguous, the court must infer the parties' intent from its plain language, not from extrinsic evidence. *Dimmit Chevrolet v Southern Fidelity Ins. Corp.,* 636 So.2d 700 (Fla. 1993). *See also Certain British Underwriters at Lloyds*

*of London, England v Jet Charter Service, Inc.,* 789 F.2d 1534 (11th Cir. 1986). Similarly, the

"reasonable expectations" of the insured are not properly considered in the interpretation of clear

and unambiguous policy language. *Deni Associates of Fla, Inc. v State Farm Fire & Cas. Ins.*

*Co.,* 711 So.2d 1135 (Fla. 1998)(eschewing doctrine of reasonable expectations as guide to

policy interpretation where policy language is unambiguous, noting this approach would

effectively rewrite the contract and the basis upon which the premiums are charged). And, while

courts may consult ordinary dictionary references to supply the "common usage" or plain

meanings of words used in a policy, *Garcia* 969 So.2d at 292, in the end, "in interpreting

policies, the language [of the Policy] is the key." *Taurus Holdings,* 913 So.2d at 537.

 With these precepts in mind, the court examines the relevant Policy language.

<strong>C.  Policy Analysis</strong>

 **1.  The SEC investigation is not a "Securities Claim" under Coverage B(i).**

 As recited above, Coverage B(i) of the Policy insures Office Depot for "loss" "arising

from" a "Securities Claim" made against Office Depot as the "Organization" for "any Wrongful

Act." In turn, Section 2(y) of the Policy defines "Securities Claim" as:

> (y) "Securities  Claim" means a Claim, <u>other than an administrative or regulatory
> proceeding against, or investigation of</u> an Organization, made against any insured:
>
> (1) alleging a violation of any federal, state, local or foreign regulation, rule or statute
> regulating securities (including but not limited to the purchase or sale or offer or
> solicitation of an offer to purchase or sell securities) which is:
>
> > (a) brought by any person or entity alleging, arising out of, based upon or
> > attributable to the purchase or sale or offer or solicitation of an offer to
> > purchase or sell any securities of an organization; or

16

(b) brought by a security holder of an organization with respect to such security holder's interest in securities of such Organization; or

(2) brought derivatively on the behalf of an Organization by a security holder of such Organization.

Notwithstanding the foregoing, the term "Securities Claim" shall include an administrative or regulatory proceeding against an Organization, but only if and only during the time that such proceeding is also commenced and continuously maintained against an Insured Person.

(Emphasis supplied).

According to the carriers, because, at the outset, both "an administrative or regulatory proceeding against" and "an investigation of" the "Organization" are expressly *excepted* from the definition of a "Securities Claim," the expenses incurred by Office Depot in voluntarily responding to the SEC investigation do not constitute a loss arising from a "Securities Claim" covered under B(i). They acknowledge that the definition of a "Securities Claim" contains a "carve-back" provision in the last sentence, restoring coverage for "an administrative or regulatory *proceeding against* an Organization" under specified limited instances (i.e. if and during the time such a proceeding is also "commenced" and "continuously maintained" against an Insured Person), but urge that: (1) the "carve back" provision conspicuously does not "carve back" coverage for "an investigation of" Office Depot, as the "Organization," leaving, as the only reasonable interpretation of the policy language, the exclusion of "an investigation" from the definition of a "Securities Claim;" and (2) the "carve back" restoration of coverage for an "administrative or regulatory proceeding against an Organization" has no play here because the phrase "administrative or regulatory *proceeding*" – given its plain meaning and read in the context of the policy as a whole -- does not encompass either the SEC's informal or formal

17

investigation of Office Depot.

For its part, Office Depot contends that the Policy definition of a "Securities Claim" is ambiguous, ill-defined and circular, with confusing cross references between the definition of "Securities Claim" under B(i) and "Claim" under B(ii), and seemingly inconsistent provisions which exclude and then purport to restore coverage for "administrative or regulatory proceedings against" the Organization.

Office Depot contends that this confusion is aggravated by the Policy's failure to define an "administrative or regulatory proceeding," as used the Section 2(y) "carve back" clause, creating an ambiguity which must be liberally interpreted in favor of coverage under established rules of insurance policy construction. Broadly construed in favor of coverage, it contends that the phrase "administrative or regulatory proceeding" is properly read to include the SEC's informal and formal investigation of Office Depot which began on July 17, 2007. Contending that the SEC also "commenced and simultaneously maintained" related investigatory "proceedings" against Insured Persons [Office Depot officers and directors] during this same time frame, Office Depot concludes that both prescribed elements of a "Securities Claim" are established under the Section 2(y) "carve back" clause. From here, it contends that the carriers are obligated to pay all "Loss" arising from that "Securities Claim," including the costs it incurred since July 11, 2007 by voluntarily responding to the SEC's inquiry, as "Defense Costs" within the meaning of Section 2(f).

Office Depot urges that this is at least one reasonable interpretation of the relevant Policy language, one which coincides with the reasonable expectations of Office Depot, and, to the extent this view competes with another reasonable interpretation of the language, an ambiguity is

created which must be resolved with an interpretation that favors coverage.  It premises this

argument on, among other things: (1) the affidavit of an insurance industry expert,  Perry Granof,

a former Chubb executive and claim adjuster  purporting to testify as to the intent behind the

language based on his experience and familiarity with the evolution of relevant wording in other

insurance policies; (2) the affidavit of  Thomas Newkirk, a former manager in the SEC Division

of Enforcement, who offers opinions as to the practicality  and reasonableness of Office Depot's

voluntary compliance with the SEC's investigation, and (3) other cases where courts have

interpreted  the phrase "proceeding"  to include an official "investigation."

　　　As to the latter, cases construing clauses that do not contain the same definition of a

"Securities Claim" or "Claim" are inapposite and do not support Office Depot's argument. [4]

　　　As to the former, it is established in Florida that the introduction of extrinsic evidence

regarding drafting history or intent behind an insurance policy is inappropriate when the policy

language is unambiguous. *Dimmit Chevrolet, supra*, 636 So.2d 700 (Fla. 1993); *Certain British

Underwriters, etc. v Jet Charter Service, Inc.*, 789 So,2d 1534 (11th Cir. 1986). In this case, the

court finds the phrase "proceeding against" within the context of the Policy's definition of a

"Securities Claim," to be clear and unambiguous, and therefore cannot consider extrinsic

evidence regarding what degree or scope of coverage this definition was intended to provide.

---

[4]The court finds the  proffered case authorities inapposite because they either involved
situations where the word  "claim" was not defined at all, *Polychron v Crum & Forster Ins. Cos.*,
916 F.2d 461 (8th Cir. 1990); *Richardson Elecs. Ltd. v Federal Ins. Co.,* 120 F. Supp. 2d 698
(N.D. Ill. 2000), or was defined differently, *National Stock Exchange v Federal Ins. Co.*, 2007
WL 1030293 (N.D. Ill. 2007)(defining "claim" to include "a formal administrative or regulatory
proceeding commenced by the filing of a ... formal investigative order ...")(emphasis added), or
where the word "proceeding" was defined differently within a different policy structure that did
not distinguish between "proceedings" and "investigations." *Borstein v National Union Fire Ins.
Co. of Pittsburgh, Pa.*, 828 F.2d 242, 244 (4th Cir. 1987).

While the Policy does not expressly define the phrase "administrative or regulatory proceeding," this does not mean this phrase is ambiguous.  As long as language in an insurance policy, read in context of the policy as a whole, has a plain and generally accepted meaning, that language is free from ambiguity and must be enforced.  *See Garcia v Federal Ins. Co.*, 969 So.2d 288 (Fla. 2007); *Taurus Holdings, Inc. v U.S. Fid. & Guar. Co.*, 913 So.2d 528 (Fla. 2005); *Auto Owners Ins. Co v Anderson*, 756 So.2d 29 (Fla. 2000); *First Professionals Ins. Co. v McKinney,* 973 So.2d 510 (Fla. 1st DCA 2007); *Union American Ins. Co. v Maynard*, 752 So.2d 1266 (Fla. 4th DCA 2000).

Viewed in context of this Policy as a whole, the Court concludes that the phrase "administrative or regulatory proceeding against," as used in the Section 2(y) "carve back" clause, denotes something different from an administrative or regulatory "investigation of" Office Depot as the Organization.  In reaching this conclusion, the court begins with an examination of the items excluded from the definition of a "Securities Claim," noting that this term is specifically defined at the threshold to *except* "an administrative or regulatory proceeding against *or* investigation of " Office Depot as the "Organization" (emphasis added). The use of the disjunctive "or" in this phrasing demonstrates that the parties understood these categories to be distinct and separate from each other.

Thus, where the Policy's Section 2(y) "carve- back" clause restores coverage for an "administrative or regulatory proceeding against" the Organization under certain specified circumstances, it is logically presumed that the parties did not intend for a "proceeding against" the Organization to encompass an "investigation of" the Organization.  Therefore, the carve-back clause does not restore coverage for "an investigation of" the Organization.

20

Similarly, under the executive indemnity coverage extended at Coverage B(ii), the Policy likewise distinguishes between a "proceeding for ... relief" and an "investigation of" an Insured Person.  A "Claim" against an Insured Person covered under B(ii) of the Policy is defined to specifically *include* "a civil, criminal, administrative, regulatory or arbitration  proceeding for monetary, non-monetary or injunctive  relief" [Section 2(b)(2)]  *or*  "a civil, criminal, administrative or  regulatory investigation of an Insured Person"  [Section 2(b)(3)],  with both concepts further refined by a temporal reference to a specific trigger points in time [the formal commencement of a  proceeding by complaint, indictment or notice of charges under 2(b)(2), or the service of an SEC subpoena or written identification of person as a target of an investigating authority under 2(b)(3)].

Generally, courts presume that the intent of the parties to a contract resides in the language they have chosen to employ in their agreement.  If the language is clear and unambiguous, the court cannot create a new contract by finding an intent not expressed in the language used by  the parties. In this case, the parties to the  contract used precise language recognizing a distinction between a "proceeding against" the Organization on the one hand, and an "investigation of" the Organization on the other in defining a "Securities Claim" covered under B(i).  The parties also distinguished between these concepts in defining a "Claim" against Insured Persons covered under B(ii).

If the parties intended the term "proceeding against," in the context of the Section 2(y) "carve back' clause,  to include an  "investigation of" the Organization,  formal or informal, it would be pointless  to distinguish between these terms in defining what constitutes a covered "Securities Claim" against the Organization under Coverage B(i), or a covered "Claim" against

an Insured Person under Coverage B(ii).

In support of its quest for a broader interpretation within the context of the Policy's Section 2(y) carve-back clause, Office Depot cites Black's Law Dictionary's definition of the phrase "administrative proceeding."[5] Office Depot relies on this definition as authority for the proposition that the phrase "administrative proceeding" is broad enough to encompass the SEC's informal and formal investigation of Office Depot here as one of several steps normally taken by the SEC in the course of identifying and remedying securities law violations. However, that an "administrative proceeding," in the abstract, might in some contexts be loosely viewed as encompassing a preliminary agency investigation that precedes a formal adjudicative hearing, inquiry or trial does not inform the court's interpretation of the phrase "administrative or regulatory proceeding against" Office Depot as the "Organization" within the specific context of this Policy.

The court must interpret this phrase based on the plain language of the Policy, viewed as a whole and giving every provision in the Policy its full meaning and operative effect. This can only be accomplished by recognizing and enforcing the distinction between a "proceeding against" and an "investigation of" an organization or person which is captured by the Policy.

In order to give this distinction any meaning, the court must give the word "proceeding" its plain meaning, i.e. a formal legal action or hearing conducted in a court of law or before some other official tribunal. The common dictionary definition of a "proceeding" is consistent with this gloss. Merriam-Webster defines a "proceeding" as a "legal action." Merriam-Webster's

---

[5]Black's Law Dictionary defines an "administrative proceeding" to mean: "A hearing, inquiry, investigation, or trial before an administrative agency, usu. adjudicatory in nature but sometimes quasi-legislative." *Black's Law Dictionary* 51 (9th ed. 2009).

Online Dictionary, http://www.merriam-webster.com/dictionary.  Black's Law Dictionary

similarly defines a "proceeding" to mean a "lawsuit" or official business conducted by a court or

other official tribunal:

> **proceeding**. 1. The regular and orderly progression of a lawsuit, including all acts
> and events between the time of commencement and the entry of judgment.
> 2. Any procedural means for seeking redress from a tribunal or agency.
> 3. An act or step that is part of a larger action.
> 4. The business conducted by a court or other official body; a hearing.

Black's Law Dictionary 1324 [9[th] ed. 2009] .

That the word  "proceeding" connotes initiation of some formal legal action in the context

of this specific  Policy  is further  buttressed by the requirement that  an insured show *both*  that

the SEC initiated  an "administrative or  regulatory proceeding against" Office Depot, *and* that

the SEC simultaneously "commenced" and "maintained" such a "proceeding" against an Insured

Person in order to trigger coverage under the " carve back" clause of Section 2(y).   Plain

meaning and common usage require that for a "proceeding" to be "commenced" against some

person or some entity, the  proceeding must  have a beginning or origin, i.e. it must start or

begin,[6] a  function commonly understood to require the  filing of  a  formal complaint or  petition

which identifies all persons intended as respondents.

In this case, the SEC's July  17, 2007 informal "notice of  inquiry," and subsequent

January 10, 2008 formal "order directing private investigation" are both captioned "In the Matter

---

[6]Merriam-Webster defines the verb "commence" to mean "to enter upon: BEGIN
<commence proceedings>."  Merriam-Webster's Online Dictionary, http://www.merriam-
webster.com/dictionary.  Dictionary.net defines "commence" to mean "to enter upon; to begin; to
perform the first act of (transitive) or "to have a beginning or origin; to originate; to start; to
begin (intransitive)." Dictionary.net, http://www.dictionary.net .

of Office Depot, Inc.," naming the business of Office Depot as the topic of inquiry;  neither

identifies any particular officers or directors as respondents or potential targets of a civil,

criminal,  administrative or regulatory proceeding.  Although the formal order contains general

statements making reference to the conduct of Office Depot's officers, directors and employees

as participants in "possible violations" of the securities laws, it does not identify any specific

officer or director as a wrongdoer by name and does not affirmatively allege an actual violation

of the securities laws.  Similarly, while  the SEC's intervening July 31, 2007  letter to Office

Depot requesting preservation of documents during the SEC investigation referred to specific

Office Depot officers and directors, the letters were not sent to the individual officers or

directors, nor did the letters allege violations of securities laws or indicate  that a proceeding may

be commenced against anyone. This  SEC activity cannot, under the plain meaning of the word,

be viewed as "commencement" of  a "proceeding against" any Insured Person within the

meaning of the Section 2(y) "carve back" clause.

Considering the normal meaning of the term, and the other uses of the term  in the

relevant Policy, the court thus concludes that  the phrase "proceeding against" in the context of

the Policy's  Section 2(y) "carve back" clause defining a "Securities Claim,"  refers to formal

legal action, such as the filing of a lawsuit or administrative complaint, or the conduct of a

formal adjudicative hearing, as the carriers contend, and does not encompass  preliminary

agency investigatory action,  as Office Depot contends.

Because this is the only reasonable interpretation of the words  "proceeding against"

within the context of the Section 2(y) "carve back" clause, read in context of the Policy as a

whole, this phrase is not ambiguous.  Accordingly, the court eschews extrinsic evidence of the

24

parties' intent or "reasonable expectations" of the insured in its interpretation of this clear and unambiguous language.

Under its plain meaning and ordinary sense, the phrase "administrative or regulatory proceeding against," in this specific context,  does not include the SEC's informal or formal investigation of  Office Depot. The company's SEC voluntary  response costs are therefore not "loss[es] of [the] Organization arising from a Securities Claim made against [the] Organization" within the meaning of  the Coverage B(i) "Organization Liability" insuring clause.  The court shall accordingly grant  summary judgment in favor of the carriers on this coverage claim.

**2. The SEC Investigation is not a "Claim" under Coverage B(ii).**

Office Depot alternatively posits that the  SEC response costs which it incurred on behalf of its officers, directors and employees constitute covered  "loss" arising  from a  "Claim" against "Insured Persons" under the executive indemnity insurance extended at Coverage B(ii) of the Policy.

In response, the carriers acknowledge that the Policy definition of  a covered "Claim" under Coverage B(ii)  specifically  includes "administrative or regulatory *investigations of*" Insured Persons, but  note that Section 2(b) of the Policy narrowly limits the definition of this subspecies of  "Claim"  to two discrete signal points in time: (1) when the Insured Person is "identified in writing" by the investigating authority as a person against whom a civil, criminal, administrative or regulatory proceeding  "may be commenced;" [Section 2(b)(3)(i)],  *or* (2) "in the case of an investigation by the SEC ...  after  service of a subpoena upon such  Insured Person." [Section 2(b)(3)(ii)].

 Because the SEC informal and formal investigations began well before  either one of

these discrete signal points, the carriers maintain that the SEC investigations do not fall within

the Policy's definition of a "Claim." Therefore, the carriers contend that any response or

defense costs associated with that inquiry and investigation which Office Depot incurred on

behalf of its officers and directors did not "arise from" a "Claim made against an Insured

Person" within the meaning of the Coverage B(ii) insuring clause.

Office Depot argues that this is too narrow a reading of a covered "Claim" under B(ii),

and urges a more expansive interpretation under application of the "relation back" clause found

at Section 7(c) of the Policy. Section 7(c), which appears as the third clause in the Policy Section

captioned "Notice/Claim Reporting Provisions," provides:

> If during the Policy Period ... an Organization or an Insured shall become aware of
> any circumstances which may reasonably be expected to give rise to a Claim being
> made against an Insured and shall give written notice to the Insurer of the
> circumstances, the Wrongful Act allegations anticipated and the reasons for
> anticipating such a Claim, with full particulars as to dates, persons and entities
> involved, then a <u>Claim which is subsequently made against such insured</u> and reported
> to the Insurers <u>alleging, arising out of, based upon, or attributable to such
> circumstances, or alleging any Wrongful Act which is the same as or related to any
> Wrongful Act alleged or contained in such circumstances, shall be consider made at
> the time such notice of such circumstances was given.</u>

(Emphasis supplied)

Office Depot contends that there is a close relationship between the alleged wrongful acts

underlying Office Depot's July 11, 2007 "Notice of Circumstances," the matters investigated by

the SEC and the allegations of the securities lawsuits. It notes, for example, that the same

individuals named as defendants in the securities lawsuits, Mr. Steve Odland and Ms. Patricia

McKay, were also subjects of the SEC investigation, and eventually received subpoenas and

Wells Notices.

In light of this overlap, it characterizes the SEC investigation as a "Subsequent Claim" made against the officers and directors which alleges or arises out of the same or related acts described in its prior Notice of Circumstances. Thus, under operation of Section 7(c), Office Depot contends that this event "relates back" to the moment in time when it submitted its original "notice of circumstances" to the carriers on July 11, 2007. From here, it argues that all defense costs incurred in connection with the SEC investigation, operating as a "subsequent Claim," are captured as covered "Loss" under the Policy

The court disagrees. Section 7(c) simply defines when a "Claim" is "considered made." It allows a related subsequent "Claim" to "relate back" to the time the initial "Notice of Circumstances" was given to the insurer for purposes of assessing whether a claim was "made" within the operative policy period. That is, in the context of a "claims made" policy, a "relation back" clause simply establishes the applicable policy year in which a "Claim" falls– it does not create coverage for matters that do not constitute "Claims" in the first instance.

Put another way, to say that a "subsequent Claim" "relates back" to the original "Notice of Circumstances" under the Section 7(c) "relation back" clause simply serves to identify the policy period in which the "subsequent Claim" was made; it does not operate to expand the Policy definition of a "Claim" to absorb any allegations of wrongdoing which happen to be related or similar to the wrongdoing described in the insured's original Notice of Circumstance.

In this case, the SEC investigation is not a "Claim," within the meaning of Section 2(b), as outlined in the above analysis; therefore, regardless of whatever factual similarity or overlap the focus of the SEC investigation may share with the wrongful acts described in Office Depot's original Notice of Circumstances, the SEC investigation cannot possibly function as a "Claim...

27

subsequently made against [the] insured" for purposes of triggering the  Section 7(c)  "relation

back" clause.

The court shall accordingly enter summary judgment in favor of the carriers on this strand

of the Plaintiff's  B(ii)  coverage claim.

### 3. Office Depot's Internal Investigation and Audit Expenses and SEC Response Costs Do Not Qualify as "Defense Costs" or Covered "Loss" Which Arise From a "Securities Claim" or "Claim" Made Against Any Insured.

Office Depot makes a similar "relation back" argument with regard to the securities

lawsuits filed in November 2007.  Because those suits arise out of and allege wrongful acts

which are similar to those alleged in its original "notice of circumstances," it contends that the

securities lawsuits operate as "subsequent Claims" within the meaning of the Section 7(c)

"relation back" clause.  Thus, Office Depot asserts that all sums reasonably and necessarily

expended in the defense of those claims are captured as covered "defense costs" from the date of

the original notice of circumstance. Office Depot further argues that the operation of the "relation

back" clause in this circumstance allows it to capture both the SEC response costs and  amounts

it incurred conducting its internal investigation and audit as  "reasonable and necessary" costs

which  "related to" and were "beneficial to" its defense of the securities  lawsuits.

Unlike the SEC investigation, and as the carriers readily acknowledge, the securities and

derivative lawsuits do unquestionably constitute  "Securities Claims" against Office Depot

within the meaning of Coverage B(i).  These lawsuits also might  well constitute  "subsequent

Claims" within the meaning of Section 7(c) to the extent  that they are based on allegations of

wrongdoing related to those contained in the original Notice of Circumstances. However, it does

not follow that any pre-suit investigation costs which may have related to and benefitted the

defense of those suits [now operating as "subsequent Claims"] are transformed into a covered "loss" which "arises from" that securities litigation under operation of the Policy's "relation back" provision or otherwise.

The Section 7(c) relation-back clause simply defines the policy period in which a given "Claim" falls. It does not does expand the Policy definition of a covered "Claim," as discussed above. Nor does it expand the Policy definition of covered "Loss," as discussed below.

### a. The Policy Definition of Covered "Loss," including "Defense Costs," Does Not Include the Cost of Investigating Potential or Anticipated Claims

In seeking to recoup its pre-suit or "pre-claim" investigation expenses under this theory, Office Depot emphasizes that: (1) the Policy definition of covered "Loss" does not exclude amounts incurred in connection with the insured's investigation or evaluation of any claim or potential claim, as was the case with Office Depot's previous policy issued by Chubb[7]; (2) other carriers, including Chubb and ACE, use forms which specifically exclude coverage for loss and costs incurred by the insured before the date on which the "actual claim" is made; (3) National Union itself recently modified its standard form Directors & Officers policy to expressly provide that a Claim made after submission of a "Notification of Circumstances" relates back to the notice date "for the sole purpose of establishing whether such subsequent Claim was first made during the Policy Period," and to clarify that "Coverage for Loss arising from any such

---

[7]A predecessor Directors and Officers liability policy issued by Federal Insurance Company, effective November 30, 2000 - November 30, 2001 (referenced as the "Chubb Policy"), contained an endorsement which expressly excluded from the definition of covered "loss" "any amount incurred by the Insured Organization ... in connection with the investigation or evaluation of any Claim or potential Claim by or on behalf of the Insured Organization." Affidavit of Kathy L. Schroeder, Office Depot Senior Director of Global Risk Management [DE# 104-3].

subsequent Claim shall only apply to Loss incurred after that subsequent Claim is actually made against an Insured." Office Depot contends that National Union could have readily included comparable language in the Policy at issue in this case, but did not, thereby opening the door for recovery of pre-suit investigation costs as "defense costs" subsumed under the Policy definition of covered "Loss."

The court disagrees. Coverage B extends coverage for "Loss" of Office Depot, as the Organization, "arising from" either a "Securities Claim" against the Organization, or a "Claim" against an Insured Person. The Policy defines "Loss" to include "Defense Costs," which are in turn defined in pertinent part at Section 2(f) of the Policy to mean "reasonable and necessary fees, costs and expenses ...resulting solely from the investigation, adjustment, defense and/or appeal of a Claim against an Insured...."

The phrase "arising out of" or "arising from," when used in an insurance contract, is broad and means "originating from," "having its origin in," "growing out of," "flowing from," "incident to" or "having a connection with." *Taurus Holdings Inc. v United States Fidelity & Guaranty Co.*, 913 So.2d 528 (Fla. 2005). The term "requires more than mere coincidence," but less than proximate cause. *Id.*

Applying this gloss here, the court finds that the phrase "arising from," as used in the Coverage B(i) insuring clause, connotes a sequential relationship between the covered event [the "Claim" or "Securities Claim"] and the covered "Loss" which "arises from" it. "Loss" which "arises from" a "Claim" or "Securities Claim" is logically understood to mean loss which "grows out of" or "flows from," and therefore follows sequentially in time. It does not include related pre-suit or pre-claim investigation costs, regardless of how "related" or "beneficial" those

30

costs may have ultimately proved to be in defending against the claim which ultimately materialized.

That the Policy does not specifically exclude "pre-claim" investigation costs from the definition of covered "Loss" and "defense costs" does not detract from this plain reading of the Policy.  The Policy definition of covered "Loss" does not encompass pre-suit or pre-claim investigation costs.   Since the Policy does not cover these losses in the first instance, there is no reason to carve out a  policy exclusion to eliminate them.  That other policies may be structured to expressly exclude this  type of expense does not compel  a different interpretation.

Office Depot is essentially seeking to recover the cost of investigating a "potential claim" against it, when the Policy definition of covered "Defense Costs," encompasses only the cost of investigating an actual "claim."   As a sister court aptly expressed  in rejecting a similar demand for recovery of "pre-claim" investigation costs,  fashioned on theory that the expenses were useful to the insured and reasonably related to defending against the "Claim" which ultimately materialized:

> [T]he plaintiff's interpretation contradicts the plain language of the policy. If the parties intended to define "Defense Costs" as including costs incurred in defending or investigating *potential* claims, they should have stated as such. However, the policy unambiguously defines "Defense Costs" as fees and expenses incurred "in defending or investigating Claims."  Common sense dictates that a Claim must first exist in order for plaintiff to defend or investigate it.

*National Stock Exchange v Federal Ins. Co.*, 2007 WL 1030293 * 6  (N. D. Ill. 2007).

Similarly, in  this case, having determined that the "Securities Claim" against Office Depot materialized when the securities lawsuits and shareholder derivative lawsuits were filed against it

in November, 2007, and having determined that "Claims" against certain Office Depot officers and directors materialized in late 2008 via the SEC's issuance of subpoenas, and in late 2009 via the SEC's issuance of Wells notices, the court concludes that Office Depot cannot recover for expenses incurred on its own behalf or on behalf of Insured Persons before these "Claims" existed.

In addition, as the carriers correctly contend, these costs did not "result *solely from* the investigation ...[or] defense ... of a Claim against an Insured" as required by the Policy definition of "Defense Costs" set forth at Section 2(f) . The internal investigation and audit was triggered in the first instance, as Office Depot admits, by a whistleblower complaint which it received in July 2007, before the time it received the informal notice of inquiry from the SEC. The internal investigation was completed by November 8, 2007, when Office Depot announced a restatement of its financials based on the investigation's results.

Thus, the costs associated with the Audit Committee Review resulted, in the first instance, from a whistleblower complaint, and later as part of Office Depot's compliance efforts in its voluntary interface with the SEC. These costs therefore cannot be said to have "resulted solely from" Office Depot's defense or investigation of the securities lawsuits. While these costs may well have reasonably been incurred in contemplation of anticipated or potential litigation, that is not enough to meet the Policy's requirement that they "result[ed] solely from" the investigation or defense of a Claim against an insured for purposes of satisfying the Section 2(f) definition of "Defense Costs."

Accordingly, the court shall enter summary judgment in favor of the carriers on this strand of plaintiff's B(i) and B(ii) coverage theory.

32

## V. DECRETAL PROVISIONS

Based on the foregoing, it is **ORDERED and ADJUDGED**:

1.  Because the relevant policy language is clear and unambiguous, the plain meaning rule applies and the court shall not consider extrinsic evidence of the parties intent.  Accordingly, the defendants' joint motion to exclude and strike the opinions of plaintiff's experts, Perry S. Granof and Thomas C. Newkirk [DE# 117] is **GRANTED**.

2.  The court determines, as a matter of law, that under the National Union Primary Policy and American Casualty Excess Policy which follows form, the sums expended by Office Depot in responding to the SEC informal inquiry and formal notice of investigation do not constitute "loss" arising from a "Securities Claim" as defined by the Policy, and the Policy does not afford coverage for such claims.

3.  The court further determines that the sums paid by Office Depot on behalf of its officers, directors and employees in connection with the SEC informal inquiry and SEC formal investigation before such individual received a subpoena or Wells notices do not constitute "loss"arising from a "Claim" as defined by the Policy, and the Policy does not afford coverage for such claims.

4.  The sums incurred by Office Depot in connection with the internal investigation performed by the Audit Committee and restatement of its financials did not "result solely from" the investigation and defense of the federal securities litigation, and did not "arise from" a covered "Securities Claim." These sums therefore do not constitute covered "loss" as defined in the Policy and the Policy does not afford coverage for such claims.

5.  The plaintiff's motion for partial summary judgment [DE# 102] is **DENIED.**

6.  The defendants' motions for summary judgment [DE# 87, 101] are **GRANTED.**

7.   The defendant National Union's motion  for oral argument [DE# 118]  is **DENIED.**

8.   A separate final summary judgment on coverage will issue accordingly.

9.    Within five (5) days from the date of entry of this order, the parties shall file written

statement with the court indicating whether there any issues remaining  for determination at trial in

light of the foregoing ruling of the court.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 15th day of October,

2010.

_____
Kenneth A. Marra
United States District Judge

cc all counsel